Daniel Keith NEWMAN, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2010–SC–000695–MR.

Supreme Court of Kentucky.

May 24, 2012.

Julia Karol Pearson, Department of Public Advocacy, Frankfort, KY, for Appellant.

Jack Conway, Attorney General, David Bryan Abner, Assistant Attorney General, Office of the Attorney General, Frankfort, KY, for Appellee.

## OPINION OF THE COURT

Daniel Keith Newman appeals from his conviction of two counts of first-degree sodomy and one count of attempted first-degree sexual abuse. Concluding no reversible error occurred in the guilt phase of Appellant's trial, we affirm Appellant's convictions. However, because the jury was improperly instructed as to the sentencing range, we vacate Appellant's life sentence and remand for a new penalty phase.

On June 3, 2009, a Grant County grand jury indicted Appellant for two counts of first-degree sodomy for "engag[ing] in deviate sexual intercourse with [B.C.], a person who is incapable of consent because he is less than twelve years old." The same indictment charged Appellant with one count of first-degree sexual abuse, for having "sexual contact with [J.M.], a person less than twelve years old, and/or through the use of forcible compulsion." Prior to trial, the trial court granted the Commonwealth's motion to amend the indictment to include forcible compulsion as an alternate theory with regard to the first-degree sodomy charges.[1] All of the incidents were alleged to have occurred on or about May 14, 2009.

At trial, B.C. testified that on May 14, 2009, he was eleven years old, and lived

---

1. Accordingly, the amended indictment charged Appellant with two counts of first-degree sodomy for "engag[ing] in deviate sexual intercourse with [B.C.], a person who is incapable of consent because he is less than twelve years old, or by the use of forcible compulsion."

with his mother and stepfather.[2] May 14, 2009, was a Thursday, and, although B.C. would normally have been in school that day, he was suspended at the time. Therefore, he spent the day with his grandmother at her apartment in Grant County. Appellant lived in a ground floor apartment underneath B.C.'s grandmother's apartment.

B.C. was friends with other boys who lived in the apartment complex. That afternoon, after his friends returned from school, B.C. and his friends played on a hill behind the apartment building. At some point B.C. went to the area of the building where Appellant's sidewalk and apartment were, because he "heard other kids over there." B.C. saw two of his friends, J. and Z., hosing off Appellant's sidewalk. The hose was coming from one of Appellant's windows. The front door to Appellant's apartment was open and Appellant's living room was visible. B.C. testified that at this time there were five children outside in front of Appellant's door—he, Z., R., J., and J.M.

Through the door, Appellant asked R. if he was any good at video games. R. said he was okay at them. Appellant then invited the boys into his apartment saying he needed help with a game he was playing. Although the door was open, there was a dog gate blocking the entrance, so the boys stepped over it and into the apartment. B.C.'s testimony indicated that he, J., and R. went into Appellant's apartment.[3]

B.C. testified that, once inside, they sat on the couch. R. noticed Appellant's blue and gray cell phone sitting on the coffee table. R. said it was a "cool" phone and asked Appellant if he could have it. Ap-

pellant said he did not give out free phones and that the boys would have to do something for it. The boys said they would do anything for the phone, to which Appellant replied, "Do anything, like what?"

When asked what was said next, B.C. testified that they just kept saying they would do anything to get the phone. At some point, B.C. and J. left the apartment, leaving R. inside. J. went back into the apartment while B.C. talked to a girl who was outside. After B.C. had finished talking to the girl, J. came out and said that Appellant was "a molester," and that he was talking to R. "about having sex and dirty stuff like that." J. rode off on his bike. B.C. did not believe J., and went back into the apartment. B.C. asked Appellant and R. about what J. had said and the two told him they were "just playing."

R. left, leaving B.C. alone in Appellant's apartment. When B.C. decided to leave, he had stepped one foot over the dog gate when Appellant grabbed him, put a hand over his mouth, and lifted him over the dog gate. Appellant shut the door and took B.C. to his bedroom. Appellant then pushed him forcefully down onto the bed. B.C. testified that he was wearing tennis shoes, blue jeans, a gray pair of underwear that were like shorts (referred to hereafter as "shorts"), and a t-shirt. Appellant told B.C. to drop his pants.

B.C. testified that he was afraid of Appellant, so he obeyed and pushed his pants and shorts below his knees. Appellant then sucked and played with B.C.'s penis. At some point Appellant stopped, and told B.C. that if he ever told anybody about what had happened, "he would have his people in the courtroom when we went to

---

**2.** B.C. testified that his date of birth was June 23, 1997. He was thirteen years old when he testified at trial on July 22, 2010.

**3.** The boy referred to as J. is not J.M., the other alleged victim. B.C. did not testify that J.M. was in the apartment.

court and they would pick out of [B.C.'s] family which one that they would "f" up." Appellant reminded B.C. that he knew where his grandmother lived. B.C. testified that Appellant then said he "did it to a little girl in Newport," at which point the Commonwealth cut off B.C.'s statement.

B.C. testified that Appellant told him to get up. B.C.'s pants and shorts were still below his knees. Appellant then got a bottle of baby oil off the dresser, put some in B.C.'s hand, and told him to put it on his (B.C.'s) penis. B.C. did what Appellant said. Appellant told B.C. to put his penis in his "butt." Appellant took his clothes down and lay on the bed with his "butt" in the air. B.C. put his penis between Appellant's "butt cheeks." About that time, B.C.'s grandmother yelled for him, and B.C. and Appellant jumped up and pulled their clothing up. Appellant pulled B.C. into the kitchen, where he grabbed the phone charger, and then into the living room, where he grabbed the phone. He put the phone and charger in B.C.'s pocket, and told him not to tell anyone who gave him the phone. When B.C. went out the door, his grandmother was on her balcony and told him to get up there.[4] Once inside, she asked him why he was in Appellant's apartment. B.C. told her "it was nothing," and that they were playing video games. He testified that he did not tell her what happened because he was afraid Appellant would hurt his family. His grandmother did not see the cell phone.

Shortly thereafter, B.C.'s mother came to pick him up, and they went home. When he got home, he took a shower because he felt dirty. He left his clothes on the bathroom floor. Thereafter, B.C. went in his bedroom and began playing with the phone. His stepfather walked in and asked B.C. where he got the phone. B.C. told him that his friend J. gave it to him. His stepfather told B.C. he did not believe him and took away the phone and charger.

The next day, Friday, May 15, 2009, B.C. was home all day with his mother. He was present when his mother got a phone call from the Grant County Sheriff.[5] While speaking to the sheriff, B.C.'s mother asked B.C. if he had seen anything at his grandmother's house that involved "a guy" and whether he or any other kids were in "the guy's" apartment. B.C. told his mother no. He testified that he lied to his mother because he was scared. After his mother got off the phone with the sheriff, she questioned B.C. about where he got the phone, but he continued to lie and tell her he got it from his friend.

B.C. then went to his room and got a marker and a piece of paper and wrote down everything that had happened. He testified that he wrote it down because he was too embarrassed to tell his mother. He handed it to his mother and stayed in the room while she read it. His mother called the sheriff back. B.C.'s mother told him to type on the computer what he had written down, which he did. The two then went to his grandmother's to meet with the sheriff. B.C.'s mother gave the sheriff the shorts B.C. had worn during the alleged incident, the phone and charger, and B.C.'s typed statement.

J.M. testified that he was ten years old on May 14, 2009. At the time, he lived in an apartment in the same subdivision as

---

**4.** B.C.'s grandmother testified that B.C. was staying with her on May 14, 2009. She testified that when she came out on her balcony that afternoon and yelled for B.C., she saw him come out of Appellant's apartment door. When she asked him what he was doing in

there, B.C. did not tell her that anything bad had happened.

**5.** B.C.'s mother was deceased at the time of trial.

B.C.'s grandmother and Appellant. He testified that he had never met Appellant or been in his apartment before that day.

J.M. testified that after school, but before dinner,[6] on May 14, 2009, he, B.C., and J., were playing outside. At some point they went into Appellant's apartment. The door was open, and they were able to see inside. They stepped over a gate and sat down. Thereafter, B.C. got up to use the bathroom. Appellant, J.M., and J. were sitting on the couch. J.M. was on the end of the couch nearest the door, Appellant was on the other end, and J. was in the middle. Appellant asked him (J.M.) and J. if they wanted to make some money and they said "yeah." J.M. testified that Appellant pointed at him (J.M.) and said, "I want him, he looks like my nephew." Appellant then got up and started walking around the coffee table and said that if he went to court he would "kill everybody in my [J.M.'s] family and burn down my house."

J.M. testified that Appellant grabbed a nearby SpongeBob toy and "walked" it up J.M.'s leg while he stuck his other hand down J.M.'s pants. J.M. testified that Appellant's hand did not touch his penis, although it came "pretty close." J.M. squirmed away and ran out the door, with J. right behind him. They "took off" and did not know what happened with B.C. J.M. testified that at school the next day, he talked to his friends and a teacher about what had happened.

Grant County Sheriff Chuck Dills testified that he was called to a school on May 15, 2009, in order to investigate a possible sexual assault teachers had overheard some children talking about. Pursuant to the investigation, he spoke with B.C.'s mother. After B.C.'s mother phoned back,

he instructed her to collect the clothing B.C. was wearing on May 14, the cell phone and charger, and B.C.'s typed statement, and meet him at B.C.'s grandmother's apartment. As a result of his investigation, he arrested Appellant around 10:40 p.m. that evening. Appellant denied the allegations. Appellant said he had thrown the cell phone on a chair outside his front door because it would not hold a charge, and that there were some kids playing outside and he let a child who asked for the phone have it. Appellant consented to a search of his apartment.

Kentucky State Police forensic analysts testified that a t-shirt (which belonged to Appellant) taken from Appellant's apartment tested positive for the presence of semen which matched Appellant. The gray shorts B.C. was wearing on May 14 tested positive for saliva and baby oil on the inside and outside front. The saliva matched a mixture of B.C. and Appellant's DNA.

Appellant testified in his own defense and denied all of the allegations against him. Appellant testified that he was a trucker and had come home the morning of May 14, 2009, from a run to deliver airplane parts to airports in Boston and New York. He had been gone for two days. He spent the day of May 14, 2009, in his apartment—sitting around, doing chores, watching a movie, and, finally, sleeping. He was awakened at about 4:00 p.m. by his dog barking. He heard children's voices and realized the children were playing in the window well outside his bedroom. Appellant did not want the children to play there, so he went to the window and yelled at them to leave.

---

6. J.M. testified that he usually got home from school around 4:00 p.m., and ate dinner at about 5:00 or 6:00 p.m.

Appellant went outside and chatted with a neighbor about mud on the sidewalk and then went to the post office. When he got home, he got his hose to spray the sidewalk. He hooked the hose up to a spigot inside his apartment and ran it out the window. He decided to spray his car off first. Appellant's phone rang and he went in to answer it. When he came back out, B.C., who Appellant did not know, was holding the hose. B.C. did not want to give the hose back and was doing a good job spraying the sidewalk, so Appellant let him continue and went back in his apartment. Appellant sat on the couch with the door open. Appellant testified that he had been having trouble with his cell phone, which had been troublesome since he bought it and would not keep a charge. Frustrated, because he needed a dependable phone for his job, he threw it out the front door where it landed on a chair.

Appellant heard B.C. and another child, R., arguing over the hose. When he came out, R. was leaving. Appellant told B.C. that if they were going to fight over the hose and waste water, he would do it. Appellant saw that B.C. had done a good job spraying the mud off the sidewalk, so Appellant gave him a couple of dollars for doing it.

When B.C. finished, he sat in the chair on Appellant's porch and saw the cell phone in the chair. Appellant told him it did not work very well. B.C. asked if he could have it and Appellant said that he could. B.C. put the phone in his pocket. Appellant began hosing off his neighbor's welcome mat. B.C. held up Appellant's bottle of baby oil, which was on the porch, and asked what it was. Appellant testified that he used baby oil on his arms to keep his skin from drying out in the sun. When he noticed B.C. pouring the baby oil into his hand, Appellant told him not to waste it, so B.C. put the cap on the bottle and set it just inside Appellant's front door and left.

Sometime later, B.C. came back and asked for the charger because the phone was dead. Appellant noticed that the phone was covered with baby oil. B.C. said he had gotten it all over him and asked to wash his hands. Appellant went inside, turned the hose back on, and got the phone's charger, battery, and SIM card. He also grabbed a washcloth, which he had used to clean up that morning, out of the sink and gave it to B.C. to use to wipe his hands off. Appellant testified that he used the sink to spit his chewing tobacco into.

Appellant went back inside to get a towel for B.C. to dry his hands. When he came out, he noticed B.C. with his back to him, "doing something." When B.C. turned around, Appellant saw B.C. pull the washcloth out of his pants. In answer to Appellant's asking B.C. what he was doing, B.C. said he had gotten baby oil "all over [his] weenie" and wanted to wipe it off. Two other boys were outside with B.C. at this point as well. B.C. left because his grandmother called for him twice, but he did not want to go.

At some point, Appellant went inside and shut the door. Later, he heard someone beating on the balcony support. When he went to investigate, he found B.C. beating it with a big stick. He asked B.C. what he was doing, and B.C. said he was bored. Appellant had noticed earlier that his tobacco was missing. He asked B.C. about it, and B.C. said he had it and would not give it back. Appellant told B.C. that if he were going to steal, he wanted his phone back. B.C. told him he would not return the phone either. Appellant told B.C. he would call the police and tell them B.C. stole it, but testified that he would not really have done that. B.C. ran away. The two boys that had been outside

with B.C. came to Appellant's door and told him they had heard he was giving out free cell phones. Appellant said no and told them to leave.

Later, he was getting ready to take a shower when he heard the pipe that held open his bedroom window make a noise. He went into the bedroom and discovered B.C. had taken the screen out of his window, had his hand on the windowsill, and was sticking his head in the window. Appellant said "what in the hell you doing," and told B.C. to get out of there. B.C. ran off. Then he heard the beating noise again. This time, B.C. was out on his grandmother's balcony, swinging the stick down, hitting the balcony support. Appellant told B.C. not to hit his hummingbird feeder, and B.C. replied that he was trying to hit the hummingbirds. Appellant yelled at him, and that was the last time Appellant saw B.C. Appellant left the house around 6 p.m. to run an errand and got back home around 9 p.m.

Appellant testified that he had worn the t-shirt on which the semen had been found the night before, when he "was with a woman." He stated he had never molested B.C. or J.M., that they had not been in his apartment, and that he did not even know who J.M. was.

The jury was instructed on two counts of sodomy in the first degree as to B.C., under theories of forcible compulsion and victim under twelve years of age as alternatives.[7] The jury was instructed on one count of first-degree sexual abuse as to J.M., under theories of forcible compulsion and age under twelve, with criminal attempt as a lesser-included offense. The jury found Appellant guilty of both counts of first-degree sodomy under the forcible compulsion theory and guilty of criminal attempt of first-degree sexual abuse as to J.M. under the forcible compulsion theory. The jury recommended a life sentence for each of the sodomy convictions. Appellant was sentenced in accordance with the jury's recommendation.[8] He appeals to this Court as a matter of right.

## I. INTRODUCTION OF OTHER CRIMES EVIDENCE

■ B.C. testified that he complied with Appellant's demands because he was afraid of him. After B.C. stated that Appellant told him that if he told anyone, "he would have his people in the courtroom when we went to court and they would pick out of my family which one that they would 'f' up," the following exchange occurred.

Commonwealth: Did he say anything about knowing where your grandma lives?

B.C.: He said, "I already know where your grandma lives."

[PAUSE]

B.C.: He said he did it to a little girl in Newport . . . [interrupted by Commonwealth]

Commonwealth: Uh, no. Just listen to my questions. You listen to my questions and quit.

On appeal, Appellant contends that B.C.'s testimony that Appellant told him that he "did it to a little girl in Newport" was inadmissible evidence of prior crimes. KRE 404(b). Appellant concedes the alleged error was unpreserved, as defense counsel made no objection at trial, and requests review per RCr 10.26. The Commonwealth agrees the statement was inadmissible under KRE 404(b), but argues

---

7. KRS 510.070. The jury was also instructed on criminal attempt of first-degree sodomy as a lesser included offense of the second count.

8. Appellant received a sentence of twelve months for the attempted sexual abuse conviction, a Class A misdemeanor.

that the remark does not rise to the level of palpable error.

■ A party claiming palpable error must show a probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law. *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky.2006). Under the circumstances of this case, the alleged prior bad act was not brought to light by a third-party witness, but was a statement by the alleged victim relating a threat by the defendant (Appellant) as a reason to comply with his demands. Even though the statement has aspects of KRE 404(b), it was used to show the defendant was trying to instill fear in the victim and overcome his resistance (whether it was true or not that he had done something to a child in Newport). Because the statement was used as proof of an element of the offense (i.e., to show forcible compulsion), it was not error.

## II. *MOSS VIOLATIONS DURING COMMONWEALTH'S CROSS-EXAMINATION*

■ The prosecutor began his cross-examination of Appellant by confirming with Appellant that the story he had just given in his testimony had not been told to the sheriff on the night he was arrested. Appellant agreed that he had not told the story to the sheriff, but that this was because he wanted to speak with an attorney first. Shortly thereafter, referring to B.C.'s testimony, the prosecutor asked, "You're telling this jury when [B.C.] says he was in your apartment on May the fourteenth of 2009, that he's lying to this jury, is that right?" Appellant responded affirmatively. Referring then to J.M.'s testimony, the prosecutor asked, "When [J.M.] tells this jury under oath that you stuck your hand down his pants toward his penis, he's lying?" Appellant responded affirmatively.

■ On appeal, Appellant contends, and the Commonwealth concedes, that the prosecutor's questions were improper. It is well settled that "[a] witness should not be required to characterize the testimony of another witness . . . as lying. Such a characterization places the witness in such an unflattering light as to potentially undermine his entire testimony." *Moss v. Commonwealth*, 949 S.W.2d 579, 583 (Ky. 1997). Appellant argues that by requiring him to essentially call B.C. and J.M. "liars," the Commonwealth cast him in such an unflattering light that it completely undermined his entire testimony. Appellant concedes the error is unpreserved, as defense counsel offered no objection to the questions at issue, and requests review per RCr 10.26.

■ This case involved two completely opposing versions of events. The defense theory was that the boys were lying, not, for example, that they were mistaken, coerced, or that their memories were the product of suggestion. Therefore, the accusation was, in a sense, already before the jury. Accordingly, we conclude the mere verbalization of the defense theory by the prosecutor, although improper, did not rise to the level of palpable error under the facts of this case. *Martin*, 207 S.W.3d at 3.

## III. *ERROR IN SENTENCING APPELLANT FOR FIRST-DEGREE SODOMY AS A CLASS A, RATHER THAN CLASS B, FELONY*

■ Appellant argues that he was improperly sentenced under the Class A felony guidelines for his sodomy convictions, because the jury convicted him of only a Class B felony. During discussion of the penalty phase instructions, defense counsel objected to the instructions regarding the

first-degree sodomy convictions, because they provided the jury the Class A (20 to 50 years, or life), rather than the Class B (10 to 20 years) range. Defense counsel argued that because Appellant had not been found guilty of sodomy of a person under twelve (a Class A felony), but rather sodomy under forcible compulsion (a Class B felony), the Class B sentencing range applied. The trial court overruled the objection, and the jury ultimately sentenced Appellant to life for each of the sodomy convictions. On appeal, Appellant argues that the sentence was improper. We agree.

KRS 510.070 provides as follows:

(1) A person is guilty of sodomy in the first degree when:

(a) He engages in deviate sexual intercourse with another person by forcible compulsion; or

(b) He engages in deviate sexual intercourse with another person who is incapable of consent because he:

1. Is physically helpless; or

2. Is less than twelve (12) years old.

(2) Sodomy in the first degree is a Class B felony unless the victim is under twelve (12) years old or receives a serious physical injury in which case it is a Class A felony.

The guilt phase instructions as to the sodomy charges read as follows:

### INSTRUCTION NO. 1 FIRST–DEGREE SODOMY

You will find the Defendant Daniel Keith Newman guilty of First–Degree Sodomy, under this instruction, if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or about the 14th day of May, 2009, and before the finding of the Indictment herein, he en-gaged in deviate sexual intercourse by making oral contact with the penis of [B.C.];

AND

B. That he did so by forcible compulsion;

OR,

C. That at the time of such intercourse, [B.C.] was less than twelve (12) years of age.

### INSTRUCTION NO. 2 FIRST–DEGREE SODOMY

You will find the Defendant Daniel Keith Newman guilty of First–Degree Sodomy, under this instruction, if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or about the 14th day of May, 2009, and before the finding of the Indictment herein, he engaged in deviate sexual intercourse by requiring [B.C.] to insert his penis in Defendant's anus;

AND

B. That he did so by forcible compulsion;

OR,

C. That at the time of such intercourse, [B.C.] was less than twelve (12) years of age.

The verdict form corresponding to Instruction No. 1 read, in pertinent part:

We, the jury, find the Defendant Daniel Keith Newman GUILTY of First–Degree Sodomy under Instruction No. 1B (i.e. by forcible compulsion).

———————————

Foreperson

We, the jury, find the Defendant Daniel Keith Newman GUILTY of First–Degree Sodomy under Instruction No. 1C (i.e. [B.C.] less than 12).

_____
Foreperson

The verdict form corresponding to Instruction No. 2 read, in pertinent part:

We, the jury, find the Defendant Daniel Keith Newman GUILTY of First–Degree Sodomy under Instruction No. 2B (i.e. by forcible compulsion).

_____
Foreperson

We, the jury, find the Defendant Daniel Keith Newman GUILTY of First–Degree Sodomy under Instruction No. 2C (i.e. [B.C.] less than 12).

_____
Foreperson

The jury found Appellant guilty under the forcible compulsion theory for both counts of sodomy. Pursuant to KRS 510.070(2), these convictions are Class B felonies.[9] A Class B felony carries a sentence of ten to twenty years. KRS 532.060(2)(b).

Appellant contends that in order for him to have been sentenced for a Class A felony for the first-degree sodomy counts, the jury had to have found, *as an element of the crime of first-degree sodomy,* that Appellant committed the crimes on a child under twelve years of age. KRS 510.070(2). Although the instructions authorized such a verdict, the jury found Appellant committed the crimes by forcible compulsion.

The Commonwealth concedes that error occurred, in that the jury should have found B.C.'s age beyond a reasonable doubt. The Commonwealth argues, however, that because the evidence of B.C.'s age was "uncontroverted," had the jury been properly instructed, it would have undoubtedly found B.C. to be under twelve years old. Because this finding would have allowed the jury to fix Appellant's punishment under the Class A guidelines, as it did, the Commonwealth argues the error was harmless. We disagree.

The United States Supreme Court has recognized that

under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.

*Apprendi v. New Jersey,* 530 U.S. 466, 476, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (quoting *Jones v. United States,* 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999)). *Accord Dixon v. Commonwealth,* 263 S.W.3d 583 (Ky.2008); *Johnson v. Commonwealth,* 105 S.W.3d 430 (Ky.2003).

If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt. A defendant may not be expose[d] ... to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone.

*Ring v. Arizona,* 536 U.S. 584, 602, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (citations and internal quotation marks omitted).

The testimony in this case provided evidence of first-degree sodomy by both forcible compulsion and because of B.C.'s age. B.C. told the jury that his birthday was such.

---

9. There was no evidence of serious physical injury and the Commonwealth does not argue

June 23, 1997, and that on May 14, 2009, he was eleven years old. B.C. testified that when he tried to leave Appellant's apartment, Appellant put a hand over his mouth, lifted him over the dog gate, shut the door, took him to the bedroom, and pushed him forcefully down onto the bed. He threatened B.C. that if he ever told anyone, he would hurt someone in his family, and that he knew where his grandmother lived. B.C. testified that he did what Appellant wanted because he was scared.

While the instructions in this case erroneously included both age and forcible compulsion, the jury's only finding was that both counts were by forcible compulsion—Class B felonies under KRS 510.070.[10] Although the age of the alleged victim was uncontroverted at trial, the jury did not find beyond a reasonable doubt that the victim was under twelve years old.[11] *See Apprendi*, 530 U.S. at 476, 120 S.Ct. 2348. Appellant's punishment cannot exceed the maximum he would receive if punished according to the facts reflected in the jury verdict alone. *See Ring*, 536 U.S. at 602, 122 S.Ct. 2428. Therefore, Appellant was improperly sentenced under the Class A guidelines. Accordingly, it will be necessary to remand for sentencing under the Class B guidelines.

## IV. *PENALTY PHASE ERROR WHEN THE JURY WAS TOLD APPELLANT'S PRIOR CRIMES WERE AGAINST CHILDREN*

■ Appellant additionally argues that error occurred in the penalty phase when

a probation and parole officer, after testifying as to Appellant's prior convictions, told the jury that each of the crimes she had mentioned involved children. Because we are remanding for a new penalty phase, this error is moot; however, to avoid error on remand we shall address it herein.

KRS 532.055(2)(a), provides, in pertinent part, that in the penalty phase of felony cases, "[e]vidence may be offered by the Commonwealth relevant to sentencing including: 1. Minimum parole eligibility, prior convictions of the defendant, both felony and misdemeanor; 2. The nature of prior offenses for which he was convicted...." Appellant argues that the term "nature of prior offenses" permits only a general description of the crime, and hence it was error for the probation and parole officer to tell the jury the crimes involved child victims.

Since the trial of this case, we rendered *Mullikan v. Commonwealth*, 341 S.W.3d 99 (Ky.2011), which established a bright-line rule regarding what evidence is permissible in showing the "nature of prior offenses," pursuant to KRS 532.055(2)(a). Recognizing that "the nature of a prior conviction is closely akin, if not identical to, the definition of a prior conviction," we held that

the evidence of prior convictions is limited to conveying to the jury the elements of the crimes previously committed. We suggest this be done either by a reading of the instruction of such crime from an acceptable form book or directly from the Kentucky Revised Statute itself. Said recitation for the jury's benefit, we

10. The error actually was brought about, in part, by the Commonwealth, which moved to amend the indictment to include forcible compulsion as an alternative. The indictment originally charged Appellant with first-degree sodomy only under the theory the victim was less than twelve years old.

11. If there was no dispute that the alleged victim was under twelve years old, a correct instruction would not include the choice of forcible compulsion. *See* 1 Cooper, *Kentucky Instructions to Juries (Criminal)* § 4.36 (5th ed.2006).

feel, is best left to the judge. The description of the elements of the prior offense may need to be customized to fit the particulars of the crime, i.e., the burglary was of a building as opposed to a dwelling. The trial court should avoid identifiers, such as naming of victims, which might trigger memories of jurors who may—especially in rural areas—have prior knowledge about the crimes.

*Id.* at 109. On remand, therefore, the rule articulated in *Mullikan* shall apply. Where age is an element of the crime, such would be properly conveyed to the jury through the reading of the relevant statute. *Id.*

For the aforementioned reasons we affirm Appellant's convictions but vacate the sentence and remand to the trial court for a new penalty phase consistent with this opinion.

All sitting. All concur.