RENDERED: NOVEMBER 1, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0625-MR

VITO CERAULO          APPELLANT

           APPEAL FROM MCCREARY CIRCUIT COURT
v.          HONORABLE DANIEL BALLOU, JUDGE
           ACTION NO. 22-CR-00040

COMMONWEALTH OF KENTUCKY          APPELLEE

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE: EASTON, ECKERLE, AND LAMBERT, JUDGES.

LAMBERT, JUDGE: Vito Ceraulo appeals from a judgment sentencing him to

seven years' imprisonment pursuant to a jury verdict finding him guilty of sexual

abuse in the first degree. We reverse and remand.

Ceraulo and Jennifer, his then-wife, traveled from their home in New

York to attend a large gathering of Jennifer's family in McCreary County,

Kentucky in July 2019. Amy, Jennifer's then-eleven-year-old niece, was also

present at the gathering.[1]  In 2021, Amy told counselors at a church camp that Ceraulo had sexually abused her at the 2019 gathering.  After the authorities were informed, Ceraulo was indicted on one count of sexual abuse in the first degree.  A three-day jury trial was held in January 2023.

Steven Scaramuzzino, an investigator with the New York State Police who had interviewed Ceraulo, was the first witness.  Scaramuzzino testified that Ceraulo had denied the abuse allegations and referred to the matter as a "stupid girl situation" or words to that effect.  On cross-examination, Scaramuzzino agreed that children may falsely report being abused for a variety of reasons, such as seeking attention or being involved in a contentious custody dispute.

Amy was the next witness.  She testified that Ceraulo had placed his hands down the back of her pants and the front of her shirt in the summers of 2017 and 2018, but she did not report that behavior because she had naively believed that type of touching was normal.  According to Amy, during the family event in July 2019, Ceraulo got her to go to his car which was parked away from where people were swimming and visiting.  Amy stated that Ceraulo placed her in his car's trunk, removed her bikini bottoms, and touched her "aggressively."  Amy

---

[1] "Amy is a pseudonym employed by the Court to protect the privacy of the child.  We also refrain from naming Amy's . . . mother[] or the members of the family . . . ." *Stephens v. Commonwealth*, 680 S.W.3d 887, 892 n.1 (Ky. 2023).

described the color of the interior of Ceraulo's trunk and the shirt he was wearing. On cross-examination, Amy stated that she did not remember why she had gone to Ceraulo's car or whether he had digitally penetrated her. She also testified that she had experienced dreams of being abused by random people.

Next, the Commonwealth called Jonathan, Amy's uncle by marriage. Jonathan testified that the 2019 family event was the first time he had met Ceraulo. Jonathan stated that Ceraulo seemed to prefer the company of children. Jonathan stated that he told his wife, Sheena, that Ceraulo should not be left alone with Amy. However, on cross-examination, Jonathan testified that he had not seen Ceraulo isolate, or act inappropriately towards, Amy. Sheena, who testified next, largely confirmed Jonathan's testimony. She also testified that she had never seen Ceraulo inappropriately touch anyone, but she had warned Amy at the 2019 gathering not to be alone with Ceraulo.

The Commonwealth then called workers from the church camp Amy had attended in 2021. Those witnesses generally described how Amy had disclosed the alleged abuse to them.

Amy's mother was the next witness. Mother testified that Amy had disclosed that Ceraulo had touched her in her bathing suit area. Mother testified that she had never seen inappropriate touching by Ceraulo, though she did find on

Facebook a photo of Ceraulo in a shirt matching the description given by Amy of the shirt Ceraulo had worn when he allegedly abused her.

Amy's father then forthrightly described a phone call where he threatened Ceraulo's life if he returned to Kentucky. Father testified that Ceraulo did not deny it when Father called him a pedophile. But, like the other witnesses, Father testified that he had not witnessed Ceraulo behaving inappropriately.

Ceraulo's ex-wife, Jennifer, was the final witness called by the Commonwealth. Jennifer testified that she had divorced Ceraulo after learning of the allegations and had sole custody of their children. She was present when Father called Ceraulo a pedophile and agreed Ceraulo had not denied the allegation.

Jennifer testified that she had once seen Ceraulo rubbing Amy's upper thigh while she sat on his lap. She told Ceraulo he could not do that, and he responded that he did not know it was inappropriate and would not do it again. Jennifer also recounted an instance where she had observed Ceraulo slap the "butt" of another eleven-year-old niece during a camping trip.

On cross-examination, Jennifer testified that she did not fear that Ceraulo would inappropriately touch their children. When asked if any children in New York had made accusations of inappropriate touching by Ceraulo, Jennifer stated that a niece had done so. On re-direct, Jennifer said the niece had reported

-4-

that Ceraulo tickled her near her vaginal area, but Jennifer had not reported that allegation to the authorities.

Ceraulo testified in his own defense. Ceraulo stated he had not denied Father's pedophile allegation because Father would not let him (Ceraulo) talk. Ceraulo denied having been alone with Amy, having lured Amy to his car, having placed her in the trunk and having touched her intimate areas.

Before we address the crux of this appeal, which revolves around the Commonwealth's cross-examination of Ceraulo, we must first note that it has been improper under Kentucky precedent for nearly a century to ask a witness if another witness lied during his or her testimony. *Howard v. Commonwealth*, 227 Ky. 142, 12 S.W.2d 324, 329 (1928). More recently, in *Moss v. Commonwealth*, 949 S.W.2d 579, 583 (Ky. 1997), our Supreme Court held that "[a] witness should not be required to characterize the testimony of another witness, particularly a well-respected police officer, as lying" because "[s]uch a characterization places the witness in such an unflattering light as to potentially undermine his entire testimony. Counsel should be sufficiently articulate to show the jury where the testimony of the witnesses differ without resort to blunt force." For convenience's

sake, we shall refer to questions about whether other witnesses had lied, or had a reason to lie, as a "*Moss* violation."[2]

The Commonwealth mentioned some version of lying about twenty-six times during its cross-examination of Ceraulo. The Commonwealth asked Ceraulo if Scaramuzzino, Amy, or Jennifer had lied. The Commonwealth asked Ceraulo what motivation Scaramuzzino, Amy, Sheena, Mother, or Father had to lie. The Commonwealth remarked that it was keeping a list of the people Ceraulo said were lying as it wrote names on a dry erase board. Nonetheless, Ceraulo's counsel did not object, nor did the trial court take any actions *sua sponte*.[3] Despite the Commonwealth's repeated efforts to get Ceraulo to describe other witnesses as liars, the soft-spoken Ceraulo did not become combative or belligerent.

The jury found Ceraulo guilty and recommended a sentence of seven years' imprisonment. The trial court sentenced Ceraulo in accordance with the jury's recommendation, after which he filed this appeal.

---

[2] Asking a witness what motivation another witness had to lie is, essentially, a type of *Moss* violation. *Barrett v. Commonwealth*, 677 S.W.3d 326, 341 (Ky. 2023).

[3] We are empathetic to the dilemma faced by a trial judge here, since Ceraulo's counsel – for whatever reason – did not object. However, as a majority of our Supreme Court has stated, "[t]he main obligation of a trial judge is to protect the integrity of the court proceedings over which he or she is the designated gate keeper." *Brown v. Commonwealth*, 226 S.W.3d 74, 86 (Ky. 2007) (Cunningham, J., concurring, joined by three other justices). Thus, a trial judge in similar circumstances should take necessary remedial steps *sua sponte* to ensure the trial remains fundamentally fair. For example, since witness credibility determinations are the sole province of the jury, *Taylor v. Commonwealth*, 671 S.W.3d 36, 44 (Ky. 2023), a judge may orally inform the jurors that only they may determine which witnesses to believe.

Ceraulo raises two issues, both of which he admits were not preserved for appellate review.[4] First, he argues the repeated *Moss* violations were reversible prosecutorial misconduct. Indeed, "[a]n unpreserved *Moss* violation is sometimes reviewed not as a trial court error but as a form of alleged prosecutorial misconduct . . . ." *Ordway v. Commonwealth*, 391 S.W.3d 762, 789 n.16 (Ky. 2013). Second, he contends the trial court erroneously allowed the Commonwealth to elicit victim impact evidence during the guilt phase.

We begin our analysis by reciting the standards governing our review. Because Ceraulo did not preserve either issue, he is entitled to relief only if we discern the existence of palpable errors resulting in manifest injustice. Kentucky Rules of Criminal Procedure (RCr) 10.26. A manifest injustice occurs upon a showing of a "probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006). To be palpable, an error must be "shocking or jurisprudentially intolerable." *Id.* at 4. Although many cases involving palpable error review have focused on whether the error altered the result of the proceeding, a manifest injustice also exists when an error "seriously

---

[4] "We have considered the parties' extensive arguments and citations to authority but will discuss only the arguments and cited authorities we deem most pertinent, the remainder being without merit, irrelevant, or redundant." *Schell v. Young*, 640 S.W.3d 24, 29 n.1 (Ky. App. 2021).

affected the fairness, integrity, or public reputation of the proceeding." *McGuire v. Commonwealth*, 368 S.W.3d 100, 112 (Ky. 2012) (internal quotation marks and citation omitted).

The standards governing our review of alleged prosecutorial misconduct are similar. "[P]rosecutorial misconduct can assume many forms, including improper questioning and improper closing argument . . . . Where there was no objection, we will reverse only where the misconduct was flagrant and was such as to render the trial fundamentally unfair." *Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky. 2010). We use a four-pronged test to determine if prosecutorial misconduct is flagrant: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Bowling v. Commonwealth*, 553 S.W.3d 231, 243 (Ky. 2018) (internal quotation marks and citation omitted).

But we must first determine whether there even was any misconduct because the Commonwealth surprisingly asserts there were no *Moss* violations during Ceraulo's trial. After all, non-existent misconduct cannot entitle an appellant to relief.

Simply put, the Commonwealth's argument is completely without merit. To show why, we need to relate only a few representative examples of the

-8-

numerous *Moss* violations.  The Commonwealth asked Ceraulo:  "So he's [Scaramuzzino] lying?"  Video Record (VR), 1/20/23 at 12:26:43.  That question is a *Moss* violation.  Another time, the Commonwealth asked Ceraulo:  "So they're all lying?"  *Id.* at 12:39:02.  That question is a *Moss* violation.  The Commonwealth stated that Father had described Ceraulo as a pedophile and asked Ceraulo:  "He's wrong about that too then, right, he's lying?"  *Id.* at 12:40:39.  That question is a *Moss* violation.  Finally, the Commonwealth asked Ceraulo:  "Amy must be lying too then, right?"  *Id.* at 12:44:10.  That question, which goes to the very heart of the largely he said/she said nature of the criminal charge, is a *Moss* violation.

Turning to the prosecutorial misconduct flagrancy factors, the *Moss* violations clearly were deliberate and extensive.  Ceraulo has not clearly shown that the *Moss* violations misled the jury.  As to the strength of the evidence prong, obviously that factor is rarely going to favor a criminal defendant since there had to be evidence sufficient to convince a jury to unanimously find the defendant guilty beyond a reasonable doubt.  Here, Amy testified that Ceraulo vigorously touched the area normally concealed by her bikini bottoms.  Jennifer testified as to other alleged instances of improper touching of young female relatives by Ceraulo.  However, we cannot characterize the evidence as overwhelming since there were no additional eyewitnesses to the alleged abuse or even to Ceraulo being alone

with Amy near his vehicle. Moreover, Ceraulo adamantly denied the allegations. On balance, this factor, at most, slightly favors the Commonwealth given the combination of Amy and Jennifer's damning testimony.

In sum, there is a state of relative equipoise regarding the four flagrancy factors. However, we conclude the trial was rendered fundamentally unfair by the Commonwealth's repeated *Moss* violations. As our Supreme Court has held, "[i]n the end, our review must center on the essential fairness of the trial as a whole, with reversal being justified only if the prosecutor's misconduct was so improper, prejudicial, and egregious as to have undermined the overall fairness of the proceedings." *Dickerson v. Commonwealth*, 485 S.W.3d 310, 329 (Ky. 2016) (internal quotation marks and citations omitted).

A bedrock principle of the American legal system is that "[t]he decisions of courts, until overruled, must be respected and obeyed by trial counsel. This standard applies, a fortiori, to those men and women who represent the Commonwealth in criminal prosecutions." *Moore v. Commonwealth*, 634 S.W.2d 426, 438 (Ky. 1982). Indeed, the Commonwealth bears a special responsibility to ensure that a trial is fundamentally fair. "Unlike other attorneys, [a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate. The sovereign, represented in a criminal trial by the prosecutor, has an interest not that it shall win a case, but that justice shall be done." *Caudill v. Commonwealth*, 374

S.W.3d 301, 309 (Ky. 2012) (brackets original to *Caudill*) (internal quotation marks and citations omitted).

Nonetheless, the Commonwealth disobeyed the plain holding of *Moss* repeatedly during its cross-examination of Ceraulo. The Commonwealth even created a *Moss*-violating visual aid by telling the jury that it (the Commonwealth) was writing a list on a dry erase board of all the people Ceraulo wanted the jury to believe were lying. The Commonwealth's persistent disregard for *Moss* was designed to harm Ceraulo in the jury's eyes and rendered this trial fundamentally unfair.

Finally, we disagree with the Commonwealth that palpable error relief is unavailable for *Moss* violations. We acknowledge that neither we nor our Supreme Court have previously granted palpable error relief based on *Moss* violations. *Barrett*, 677 S.W.3d at 341 ("This Court has not yet found such a *Moss* violation to rise to palpable error under RCr 10.26."). But we stress that every case cited by the Commonwealth is materially distinguishable because none involve as many *Moss* violations as does the case at hand. There is a quantitative and qualitative difference between a few inappropriate stray remarks and dozens of violations of binding precedent. Therefore, in the interests of judicial economy, we shall only discuss two of the cases upon which the Commonwealth primarily relies.

-11-

*Luna v. Commonwealth*, 460 S.W.3d 851 (Ky. 2015), is materially distinguishable. In *Luna*, the Commonwealth asked Luna improper questions like the ones at hand, such as: "Is everybody lying but you?" *Id.* at 879. Our Supreme Court affirmed because "Luna was a combative witness" and "where a defendant places himself in an unflattering light with an overall combative tone, the impact of such questioning by the Commonwealth is somewhat mitigated. It becomes difficult to say with any reliability whether the Commonwealth's questioning or the defendant's own recalcitrance contributed to the jury's verdict." *Id.* at 880. But Ceraulo's demeanor was mainly soft-spoken – he did not display a "combative tone" or demeanor.

Similarly, we reject the Commonwealth's argument that we must affirm based on *Newman v. Commonwealth*, 366 S.W.3d 435 (Ky. 2012). In *Newman*, our Supreme Court held that a few *Moss* violations by the Commonwealth did not rise to the level of palpable error because the defendant's theory was the victims "were lying, not, for example, that they were mistaken, coerced, or that their memories were the product of suggestion. Therefore, the accusation was, in a sense, already before the jury." *Id.* at 442. Here, Ceraulo did not classify Amy as a liar. Instead, he relied upon potential memory issues she may have experienced and his general lack of opportunity to commit the offense at

a crowded gathering. *Newman* does not foreclose Ceraulo from receiving palpable error relief.

We now turn to Ceraulo's argument that the trial court allowed victim impact evidence to be admitted during the guilt phase. Given our conclusion that the *Moss* violations require reversing Ceraulo's conviction, we shall only briefly discuss the issue to provide guidance on remand.

The Commonwealth asked Amy how the abuse had changed her. The Commonwealth asked similar questions of multiple other witnesses.

The Commonwealth is permitted to provide "background evidence" of the victim in order to allow the jury to "understand[] the nature of the crime committed[,]" but is not permitted to introduce victim impact evidence in the guilt phase. *Roe v. Commonwealth*, 493 S.W.3d 814, 823 (Ky. 2015). It is not always easy to discern the difference between the two. *Id.* at 824. "One way to determine the difference between victim impact evidence and victim background evidence is whether the evidence is aimed primarily at appealing to the jurors' sympathies or providing an understanding of the nature of the crime[.]" *Alderson v. Commonwealth*, 670 S.W.3d 884, 893 (Ky. 2023) (brackets original to *Alderson*) (internal quotation marks and citations omitted).

The challenged questions and answers here are remarkably similar to those deemed improper by our Supreme Court in *Alderson*. Specifically, the Court held that the victim's testimony:

> provided a great deal of information about how her life had changed for the worse after the crime was committed and had a long-term impact on her life. When it is evaluated for whether it constituted victim impact testimony or victim background information, by its very nature it constitutes victim impact testimony because it established the terrible consequences of the defendant's actions on her life going forward and was likely to arouse the jurors' sympathy. . . . K.M. testified that after the assault she had to go to therapy, take sleeping pills to combat recent night terrors, feared male family members, had flashbacks and went to the counselor's office to recuperate, once people found out they treated her differently, she could not visit A.A.'s house because it was the crime scene, and she is scared all of the time. K.M.'s testimony was devoted to her own recitation of her emotional state and how she had suffered *since reporting* the assault. As such, this testimony had little relevancy as to whether the crime had in fact occurred and at least some of what she described could be the result of the criminal process itself or other people learning about the assault. Admitting such evidence at this stage of the trial had little relevance and even if relevant was clearly more prejudicial than probative and could mislead the jury as to what were appropriate bases for finding guilt.

*Alderson*, 670 S.W.3d at 893-95 (emphasis original) (paragraph breaks omitted).

*Accord Stephens*, 680 S.W.3d at, 904-05 (testimony about a victim's night terrors and inability to sleep after being raped was inadmissible in guilt phase because "[i]n a case in which the resolution depends upon whether the victim or the

defendant should be believed and other evidence is lacking, the perception of the child as a victim who suffered would arouse the jurors' sympathy and could result in a verdict rooted in that sympathy rather than based on the evidence properly admitted") (internal quotation marks and citations omitted).

Consequently, we agree with Ceraulo that the trial court erred by permitting the Commonwealth to elicit victim impact evidence in the guilt phase. However, we need not determine whether Ceraulo is entitled to palpable error relief because we have reversed his conviction on other grounds.

For the foregoing reasons, the judgment of the McCreary Circuit Court finding Vito Ceraulo guilty of sexual abuse in the first degree and sentencing him to seven years' imprisonment is reversed, and the case is remanded for further proceedings consistent with this Opinion.

EASTON, JUDGE, CONCURS.

ECKERLE, JUDGE, CONCURS IN RESULT ONLY.

BRIEFS FOR APPELLANT:

Jennifer Wade
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Melissa A. Pile
Assistant Attorney General
Frankfort, Kentucky