RENDERED: FEBRUARY 18, 2016
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2014-SC-000228-MR

DARRYL PARKER                                                    APPELLANT

                 ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.                  HONORABLE BRIAN C. EDWARDS, JUDGE
                         NO. 12-CR-0065-003

COMMONWEALTH OF KENTUCKY                          APPELLEE

### OPINION OF THE COURT BY JUSTICE HUGHES

### AFFIRMING

Darryl Parker appeals as a matter of right from a Jefferson Circuit Court Judgment convicting him of four crimes, including two counts of first-degree robbery, and sentencing him as a second-degree persistent felony offender to concurrent prison terms totaling twenty-five years. The jury found Parker guilty of the November 16, 2011 robbery of a Chase Bank in the Fern Creek area of Jefferson County, of the December 30, 2011 robbery of a south Louisville motel, of tampering with physical evidence of the motel robbery by trying to conceal a handgun used in that robbery, and of being a convicted felon in possession of that same handgun. In this appeal, Parker contends that the denial of his pretrial motion for a continuance and unfair questioning during the Commonwealth's cross-examination of him tainted the guilt phase of his trial and each error requires reversal of his convictions. He also contends that the penalty phase of his trial was tainted by evidence improperly

detailing his prior offenses and that that error requires remand for a new penalty phase. Convinced that Parker is not entitled to any of the relief he seeks, we affirm the circuit court's Judgment in its entirety.

## RELEVANT FACTS

An assistant manager of the Chase Bank testified that during the late afternoon of November 16, 2011, she was working as a teller when an African-American male wearing sunglasses; a grey, billed cap; and a plaid jacket approached the glass doors of the bank with his hands in his jacket pockets. Once inside the bank, the man pulled out a black handgun, held it over his head, and announced, "This is a robbery; give me all of your money." He proceeded to bang the gun on the counter in front of the assistant manager and the other teller then on duty and demanded "big bills," and "no dye packs." The assistant manager testified that the man had tattoos on his neck. As the tellers placed money on the counter, the man grabbed approximately $300 and ran back out the front door. According to the assistant manager, the entire incident probably lasted less than a minute.

Within a few minutes a number of police officers (as many as fifteen according to one policeman) responded to the report of a bank robbery and began searching the surrounding area for the robber. According to one of the detectives who joined the search, he heard over his radio that a man had been seen running from the bank toward a nearby apartment complex, so he began his search at the complex. Lying in a roadway along the back of the complex, which was toward the bank, the detective came across a dark grey toboggan-

2

type ski mask/hat with a cap bill together with a pair of sunglasses. He reported his find and secured the area until an evidence technician photographed and collected the mask/hat and glasses. Not far from that spot another officer came across a $10 bill lying on the ground. It too was photographed, although it was not taken into evidence. Eventually, samples were taken from the hat and glasses and sent to the state forensics lab in Frankfort for DNA analysis, but in the immediate aftermath of the robbery neither the witnesses at the bank, nor anyone who had observed the robber's flight, nor anyone seeing bank surveillance images on television news reports of the robbery could (or would) identify the robber.

A long-time maintenance/security employee of what was known in 2011 as the Jameson Inn, a motel off of Fern Valley Road near I-65 in south Louisville, testified that at about 5:00 p.m. on December 30, 2011, he was seated in the motel's front lobby watching television when two people entered through the main entrance and proceeded directly down a short hallway toward the public restrooms. He paid them little attention, because guests came and went from the motel regularly. About two minutes later, he testified, the same two people accosted him from behind where he sat. Both were African-American (as was the motel employee/witness), one larger and one smaller. Both were dressed in black, though the smaller person's black top had a contrasting design on the back. Both wore black ski masks pulled down to cover their faces. The larger person, whose voice confirmed that he was

3

male, held a black handgun to the motel employee's head and demanded to be taken to the motel's safe.

The employee, one of only two people on duty at the time, accordingly led the pair to the door to the motel's office, unlocked the door, and let the pair inside. The other employee on duty at the time, a manager in charge of the front desk, was working in the office, and she explained to the robbers that neither she nor the maintenance employee had a key to the motel's safe. The robbers then proceeded, according to both employees, to take from the manager's purse, among other items, cash (about $400) and a notebook-type computer. They also demanded access to the front desk's cash drawer, and the manager responded by going to the front desk and placing the cash drawer on the counter. The smaller robber, who, both employees testified, was female, then took from the drawer several paper-clipped bundles of cash. Her actions were captured on the motel's surveillance video, and that video was later shown to the jury. According to the maintenance employee, the robbers then left the motel through the rear exit, where there was a path to a neighboring Wendy's restaurant. The manager called the police.

A few doors east of the Wendy's on Fern Valley Road was another restaurant, an Indi's. One of the several police officers who responded within minutes to the report of the motel robbery was a detective who testified that the robbers' descriptions had been broadcast on police radio, and as he drove east on Fern Valley Road away from the Jameson Inn he saw a male and a female who matched the descriptions and who appeared to have just exited that Indi's.

4

The two people walked east from the restaurant toward the motel next door—at that time a Days Inn. The female noticed his marked car, the detective testified, and several times as she walked looked back over her shoulder at it, which the detective thought suspicious. When the pair entered the Days Inn, the detective promptly parked his car and, with another officer who had just arrived, followed them inside. Before he reached the entrance, the detective saw through the Days Inn's front window the two individuals darting about in the front lobby, but as soon as he entered the lobby the two abruptly found chairs. Almost immediately, the second officer arrived in the lobby and noticed cash, what proved to be $291, tucked beneath one of the lobby beverage machines. Upon further inspection the detective saw that some of that cash was in paper-clipped bundles. The Days Inn's surveillance video and an inn employee later confirmed that upon entering the lobby, the female suspect had hurriedly tried to stuff cash beneath the machine.

The two individuals, Darryl Parker and Jodeci Chadwick, were eventually arrested and searched. The search yielded an additional $45 in the possession of Chadwick and $293 in the possession of Parker. Thus, the amount—$668— allegedly taken from the Jameson Inn ($268) and its manager (about $400) was closely approximated by the amount—$629—found a short time after the robbery in the possession of Chadwick ($336) and Parker ($293).

Chadwick and Parker having possibly visited the Indi's, investigators checked there, too. On the Indi's surveillance video the two were recorded entering the hallway leading to the restrooms. In the trash receptacle in the

5

men's room, an officer found a black semi-automatic handgun loaded with five (or six) live 9 mm bullets, one of which was in the chamber ready to be fired.[1]

Meanwhile, another officer investigated the Wendy's parking lot a short distance from the back door through which the robbers had exited the Jameson Inn and there he found a 2002 Mercury Sable automobile and its owner, Rodericka Bryant. The officer could see in the Mercury a notebook computer like the one allegedly stolen from the Jameson Inn's manager's purse as well as items of clothing—for example, black ski masks, a black sweatshirt, a black jacket with contrasting stripes—like the clothing allegedly worn by the robbers. Bryant was therefore arrested in addition to Chadwick and Parker, and all three were taken to police headquarters for questioning.

Although their accounts of the Jameson Inn robbery evolved considerably in the course of their interviews, Bryant and Chadwick eventually gave statements and later testified at trial to the effect that in December 2011 they had been in a close relationship with each other and that both were friends with Parker. Needing money for a New Year's celebration, the three friends had met at Chadwick's brother's residence in hopes of crossing paths with one of Chadwick's cousins who had recently promised Chadwick to repay a loan. When the cousin failed to appear, Parker had suggested that they "hit a lick,"—commit a robbery—instead. The women were reluctant, so to sell them on the idea Parker, they claimed, showed them, by means of his phone's

---

[1] We are unsure from the testimony whether the chambered round was in addition to five other rounds "in the magazine," or was one of the five.

internet browser, a surveillance image of the Chase Bank robber and asserted that he was that robber—thus proving that one could get away with that sort of robbery. Duly impressed, the women agreed to join Parker in a similar venture.

With Bryant driving and Parker giving directions, the threesome first had thoughts of robbing another bank. Parker and Chadwick were to do the actual robbing with Bryant serving as get-away driver. The plan got as far as Parker and Chadwick's approaching the entrance of a Fifth-Third Bank in the Louisville suburb of St. Matthews, Parker armed with a black handgun and both equipped with mask and/or sunglasses for the sake of disguise. But, according to Chadwick, they were spooked by a man who was opening the door for customers, and so before even reaching the entrance agreed to abandon the attempt and return to the car. Ominously, Bryant had trouble starting her car, but after a few tries it finally turned over, and the would-be robbers headed toward a different part of town.

Chadwick testified that as they drove she expressed frustration at the fact that they had just consumed most of their gasoline for nothing, and she complained to her friends that now they needed robbery money more than ever. Parker then gave directions to the Jameson Inn, a motel he said he was familiar with, according to Bryant, and one they could rob. Bryant testified that she first parked at a Shoney's restaurant not far from the motel, and that when Chadwick and Parker exited the vehicle they were dressed mainly in black over-clothes. She remembered both with masks, but Chadwick testified

7

that while Parker may have used a mask, she tied the arms of her sweatshirt around her face. Chadwick denied that Parker pointed a gun at the maintenance employee, but she admitted that Parker was armed with the black handgun and that he flourished it later when he demanded access to the front-desk cash drawer. She claimed that they both took cash from the cash drawer but took no cash from the manager, and she admitted that she was the one who took the manager's computer.

Bryant testified that as soon as Chadwick and Parker walked off toward the Jameson Inn she began to feel conspicuous in the only car parked in the Shoney's lot. A Wendy's restaurant was near the Shoney's, and its lot had more traffic, so Bryant drove her car to that lot, backed into a space, and waited for her accomplices. She said it felt as though she waited "forever," but it was probably no more than a couple of minutes before she saw Parker and Chadwick running toward the car from the direction of the motel, Chadwick literally with cash falling out of her pockets. Urging Bryant to "go, go, go," the robbers jumped into the car and began removing their outer clothing, throwing most of it into the back seat, where Chadwick had put the stolen computer. Bryant tried to "go," she testified, but once again her car was reluctant to start. When it failed to turn over for the third or fourth time, Chadwick and Parker decided to make a run for it. They got out of the car and hurried off down Fern Valley Road away from the Jameson Inn. Bryant testified that she did not run because she wanted to appear uninvolved in any wrongdoing, but she was so nervous that she threw her car keys onto a patch of lawn outside the Wendy's,

asked one of the several employees who happened to be outside just then on a smoking break and who saw her do that not to tell the police, and then went in to the Wendy's for a cup of ice. It was there, apparently, that a police officer found her.

According to Chadwick, she and Parker stopped briefly in the Indi's restaurant to consider their options. They decided to get a motel room where they could lie low for a while and try to call a friend for a ride, but as they were on their way to the Days Inn next door, they were spotted by a police officer. Chadwick admitted that she tried to hide most of the robbery cash in her possession under a beverage machine in the Days Inn lobby.

In addition to the testimony of Chadwick and Bryant, the Commonwealth presented expert testimony by Melissa Brown, a forensic scientist at the state crime lab in Frankfort. Ms. Brown performed DNA analysis on the samples taken from the mask and sunglasses recovered after the Chase Bank robbery, and, with respect to the Jameson Inn robbery, on samples taken from the black handgun, from both pairs of sunglasses found in Bryant's car, from a knit mask found in the car, from a knit cap found there, and from a bandana found there. The lead detective in both cases explained that the state crime lab limits the number of items it will test in any particular case, and that accordingly she had chosen for analysis items that seemed likeliest to have come into significant contact with the user's skin.

Ms. Brown testified that both Chase Bank items, the gun, one of the pairs of Jameson Inn sunglasses, and the Jameson Inn knit mask all contained

9

DNA mixtures to which it was likely (highly likely with respect to the gun and both the Chase and Jameson Inn sunglasses[2]) that Parker had contributed. Chadwick was a highly likely contributor to the DNA mixture recovered from the other pair of Jameson Inn sunglasses. And both Chadwick and Bryant were likely contributors to the bandana mixture.

The Commonwealth's proof against Parker in the Chase Bank case, therefore, included his confession to Chadwick and Bryant and the presence of what was very likely his DNA on the cap and sunglasses likely used as the disguise in that case. The proof against Parker in the Jameson Inn case included Chadwick's and Bryant's testimonies, Parker's possession of some of the stolen property in the immediate aftermath of the robbery, and the highly corroborating DNA evidence that firmly, if not conclusively, linked the black handgun to Parker.

Parker testified at trial, however, that despite these seemingly damning appearances he was not involved in either crime. He claimed that his presence with Chadwick at the Days Inn following the Jameson Inn robbery was an unfortunate case of being in the wrong place at the wrong time. At Chadwick's request, Parker testified, he had come to the Indi's restaurant minutes before

---

[2] With respect to these items, Ms. Brown testified that the odds of choosing a potential contributor at random from the relevant population was on the order of one chance in millions—hundreds of millions with respect to the gun. That is not the same, of course, as saying what the odds are that Parker was a contributor, but, in conjunction with all the other evidence of Parker's involvement in these crimes, the random match probability can reasonably be thought highly probative "source" evidence. *McDaniel v. Brown,* 558 U.S. 120 (2010) (discussing ways in which DNA evidence can be misinterpreted, but noting that the probative value of that evidence need not be assessed in isolation).

10

he was arrested to meet Chadwick and to lend her some money, and had found himself suddenly caught up in the robbery she had just committed. He denied having had anything to do with that robbery or the Chase Bank robbery. Chadwick and Bryant were pinning those crimes on him, he claimed, both to protect the real culprit—possibly Chadwick's cousin—and to curry favor with the Commonwealth, which had entered plea bargains with both women in exchange for their testimonies. He dismissed the DNA evidence as merely statistical, as not ruling out the possibility that someone other than he was the contributor to the various DNA mixtures. He also offered testimony by his own DNA expert who analyzed samples taken from two of the shirts found in Bryant's car—items the Commonwealth had not had tested—and found that those samples were inconclusive, showing neither that Parker could have been nor that he could not have been a contributor to the DNA mixtures recovered from the shirts.

Parker did not ask the Commonwealth's witness what bearing, if any, that finding had on the Commonwealth's proof that Parker was a potential and likely contributor to the DNA mixtures found on other items, and his own expert did not address the issue. Plainly, that silence limited the probative value of Parker's expert's testimony, since it left the Commonwealth's proof intact, and just as plainly, the jury ultimately found the Commonwealth's proof more persuasive than Parker's. Parker's first contention on appeal is that he was denied a fair opportunity to develop the probative value of his expert's evidence when the trial court refused to postpone the trial in order to give his

11

expert more time to assess, in light of her own testing, the Commonwealth's expert's methods and results. We agree with the Commonwealth, however, that Parker's eleventh-hour motion for a continuance was both untimely and speculative, and that the trial court did not, on the eve of trial, abuse its discretion by denying such a motion.

## ANALYSIS

### I. The Trial Court Was Within its Discretion When it Denied Parker's Belated Motion For a Continuance.

As the United States Supreme Court has observed, "[t]he matter of continuance is traditionally within the discretion of the trial judge." *Ungar v. Sarafite,* 376 U.S. 575, 589 (1964). Lest it be rendered "an empty formality," however, a criminal defendant's right "to defend with counsel," will sometimes justify delay, and when that is the case a trial court's "myopic insistence upon expeditiousness" can give rise to a due process violation. *Id.* "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process," the Supreme Court has explained. "The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar,* 376 U.S. at 589 (citations omitted). *See also, Morris v. Slappy,* 461 U.S. 1, 11-12 (1983) (noting that "[t]rial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of

12

continuances, only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel.") (quoting *Ungar*, 376 U.S. at 589); *Taylor v. Commonwealth*, 545 S.W.2d 76, 77 (Ky. 1976) (noting that "[i]nherent in the concept of right to counsel is a reasonable time and opportunity for counsel to prepare. . . . Nevertheless, the granting of a continuance is within the sound discretion of the trial court and a conviction will not be reversed for failure to grant a continuance unless that discretion has been plainly abused and manifest injustice has resulted.") (citations omitted).

This need for trial courts to balance the public interest in the efficient administration of justice against a criminal defendant's interest in an adequate opportunity to prepare and present a defense is reflected in Kentucky Rule of Criminal Procedure (RCr) 9.04, which provides in part that "The court, upon motion and sufficient cause shown by either party, may grant a postponement of the hearing or trial."[3] In *Snodgrass v. Commonwealth*, 814 S.W.2d 579, 581

---

[3] The Rule further provides in part that "[a] motion by the defendant for a postponement on account of the absence of evidence may be made only upon affidavit showing the materiality of the evidence expected to be obtained, and that due diligence has been used to obtain it. If the motion is based on the absence of a witness, the affidavit must show what facts the affiant believes the witness will prove, and not merely the effect of such facts in evidence, and that the affiant believes them to be true." Although technically this affidavit provision applies to the presentation of a defense in situations where the defendant seeks postponement on the ground that evidence (or a witness) he or she knew about and anticipated being able to introduce is absent at the time of the hearing or trial, *Gray v. Commonwealth*, 203 S.W.3d 679 (Ky. 2006), the idea that a continuance need not be granted as a remedy for the movant's own lack of diligence applies to continuance motions generally, including motions based on claims that the preparation of a defense requires further investigation. *Bartley v. Commonwealth*, 400 S.W.3d 714 (Ky. 2013) (citing *Hudson v. Commonwealth*, 202 S.W.3d 17 (Ky. 2006)).

13

(Ky. 1991), *overruled on other grounds by Lawson v. Commonwealth,* 53 S.W.3d 534 (Ky. 2001), this Court observed that under the Rule the propriety of a continuance in any given case is addressed to the sound discretion of the trial court and depends upon "the unique facts and circumstances of that case." The Court noted that the length of the delay being sought; previous continuances; inconvenience to parties, witnesses, counsel, and court; the complexity of the case; the availability of other competent counsel; whether the movant sought delay for its own sake or caused the need for it; and whether denying the continuance would lead to identifiable prejudice are factors the trial court ought in particular to consider. *Id.* Identifiable prejudice is especially important. *Morgan v. Commonwealth,* 421 S.W.3d 388 (Ky. 2014) (citing *Bartley,* 400 S.W.3d at 733); *Taylor v. Commonwealth,* 545 S.W.2d at 77 (holding that in the face of a defense motion for a continuance the trial court abused its discretion by trying a rape case two days after arraignment, but denying relief because the defendant failed to identify how the trial court's error had prejudiced him).

While the trial court's discretion under RCr 9.04 is necessarily broad, we have found abuses of that discretion a number of times in cases where the defendant's ability to prepare a defense has been undermined, or at least significantly hampered, by last minute changes in the prosecution's case,[4] or

---

[4] *See Eldred v. Commonwealth,* 906 S.W.2d 694 (Ky. 1994) (holding that the defendant in a capital murder prosecution scheduled to begin on Monday morning should have been granted a sixty-day continuance when a co-defendant pled guilty (and thus became, potentially, a prosecution witness) late the preceding Friday afternoon, in part, at least to permit inquiry into "articulable evidence" calling into

14

by the Commonwealth's failure to disclose potentially exculpatory evidence (the defendant must be able to articulate specifically the exculpatory potential) far enough in advance of trial to give the defense a reasonable opportunity to investigate.[5]

On the other hand, however, we have upheld the denial of last-minute requests for extra preparation time where there was no suggestion that the Commonwealth delayed disclosure of exculpatory evidence,[6] where the exculpatory potential of the late-sought investigation is speculative and not

---

question the co-defendant's mental health)); *Bush v. Commonwealth,* 839 S.W.2d 550 (Ky. 1992) (holding that the defendant in a wanton murder case should have been granted a continuance to reassess his defense when, immediately after defense counsel's opening statement, in which he told the jury that the defendant's girlfriend would testify that she, not the defendant, had been driving at the time of the fatal accident, the prosecutor and a police officer induced the girlfriend to invoke her Fifth Amendment right not to testify by threatening her with a perjury prosecution).

[5] *Anderson v. Commonwealth,* 63 S.W.3d 135 (Ky. 2001) (holding that the defendant in a rape case should have been granted a continuance to investigate potentially exculpatory evidence (a doctor's report and a statement by the alleged victim) disclosed by the prosecutor only four days prior to trial); *Grimes v. Commonwealth,* 2006 WL 1045459 (April 2006) (holding (in a homicide case) that the defendant, who was allowed funds "for expert assistance in the evaluation of the DNA testing performed by the Commonwealth," was entitled to a continuance to carry out that evaluation when the Commonwealth's DNA results were not disclosed until about two weeks prior to trial).

[6] *Bartley v. Commonwealth,* 400 S.W.3d at 734 (distinguishing *Anderson v. Commonwealth,* in which Commonwealth engaged in "questionable" discovery practice); *Rowe v. Commonwealth,* 2007 WL 1532334 (Ky. 2007) (upholding denial of continuance sought shortly before murder trial where defendant's claim that he needed an expert assessment of the reliability of the Commonwealth's DNA evidence was not based on articulable evidence calling the reliability of the Commonwealth's evidence into question, where the Commonwealth's DNA results were disclosed months before trial, and where otherwise the defense was able to raise the reliability issue through cross-examination of the Commonwealth's expert).

specifically "articulable,"[7] and where the change in circumstances ostensibly calling for additional preparation does not undermine an anticipated defense.[8]

This case is clearly more akin to those in which we have upheld the trial court's decision not to postpone an imminent trial than to those in which we have found an abuse of discretion. For one thing, the request for a postponement was not made in response to a late breaking disclosure by the Commonwealth. On the contrary, Parker was indicted for the November 2011 bank robbery and December 2011 motel robbery in January 2012. The DNA testing requested by the Commonwealth resulted in a lab report dated July 26, 2012. That report implicated Parker in both robberies, and hence the reliability of its results was immediately an important issue.

Parker did not, however, seek expert assistance either to evaluate the Commonwealth's evidence or to perform DNA testing of his own. He instead announced that he was ready to proceed when the matter first came to trial in March 2013. That initial attempt to try the case ended in a mistrial soon after the jury was sworn when one of the jurors failed to return after an overnight

---

[7] *Bartley*, 400 S.W.3d at 734 (holding that Commonwealth's eve-of-trial production of victim's nursing-home records did not necessitate a continuance where Commonwealth agreed not to rely on the records, where there was no suggestion that they contained any evidence favorable to the defense, and where the defense had known for months that the records might be pertinent but had not investigated); *Hudson v. Commonwealth*, 202 S.W.3d 17 (Ky. 2006) (upholding denial of continuance sought less than two weeks before trial where defendant made only conclusory claims that further investigation was needed); *Williams v. Commonwealth*, 644 S.W.2d 335 (Ky. 1982) (upholding denial of continuance where alleged last-minute need to investigate the complaining witness's competence did not have adequate evidentiary basis).

[8] *Morgan*, 421 S.W.3d 388 (anticipated alibi witness's change of heart at trial did not necessitate a continuance because alibi defense was still possible on the basis of the witness's prior inconsistent statements).

recess. Only then, in the wake of the mistrial some eight months after he learned of the Commonwealth's DNA evidence, did Parker seek funds for independent DNA analysis. Even then the analysis he sought did not include an expert assessment of the reliability of the Commonwealth's evidence, but was limited to the testing of previously untested items from the backseat of Bryant's car, apparently in hopes of implicating someone else.

That strategy failed to pan out in December 2013, when the lab report Parker commissioned not only did not implicate anyone else, but did not even exclude Parker as a possible contributor to the DNA mixture recovered from the items tested at his behest. Only then, a year-and-a-half after learning of the Commonwealth's lab results and barely two weeks before the second attempt to try the case was to commence, did Parker finally ask for time for expert scrutiny of the Commonwealth's testing. The trial court was well within its discretion at that point to decide against further delay, delay occasioned for the most part by Parker's own lack of diligence, and delay certainly inconvenient and possibly prejudicial to the Commonwealth. While the Commonwealth's case was not unduly complicated, it did require keeping track of and coordinating a large number of witnesses.

Nor was Parker's belated request for a continuance supported, as was the request in *Anderson,* by the late appearance of evidence with a significant—an "articulable"—exculpatory potential, evidence bearing more than speculatively on the defendant's right to present a defense. Parker strains to find that kind of exculpatory implication in his DNA expert's inconclusive

17

analysis of the two shirts she tested, but we agree with the Commonwealth that those results imply nothing about the results the Commonwealth obtained from its expert's DNA analysis of different items. In particular, we reject, in the absence of some expert explanation, Parker's innuendo that because his expert obtained inconclusive results, the Commonwealth's expert, had she employed proper techniques, would have obtained inconclusive results on the items she tested as well. Were there anything to that claim but Parker's own speculation, we trust that his expert would have said so during her testimony, or at the very least that Parker's brief would explain the connection, but Parker did not ask his expert to relate her testing to the Commonwealth's testing in any way, and his brief does not offer any support for that possibility, a silence that seems eloquent.

In sum, the trial court did not abuse its discretion by denying Parker's January 2014 request for a continuance to assess the reliability of the Commonwealth's DNA testing. Parker's on-the-verge-of-trial request was untimely, and its untimeliness was not the result of late disclosure by the Commonwealth; it was the result of Parker's own lack of diligence. Parker's request, moreover, was not necessitated by the late discovery of evidence with "articulable" exculpatory potential, and thus the denial of that request was not prejudicial. Under these circumstances, the trial court did not abuse its discretion and Parker is not entitled to relief.

## II. The Prosecutor's Alleged *Moss* Violation Did Not Amount to a Palpable Error.

Parker also contends that the guilt phase of his trial was rendered unfair when, on cross-examination, the prosecutor asked him to characterize the truthfulness of another witness's testimony. Parker concedes that he did not preserve this issue for ordinary review by objecting to the prosecutor's question, but he claims that the prosecutor's misconduct was blatant and prejudicial enough to merit relief under RCr 10.26, the palpable error rule, and Kentucky Rule of Evidence (KRE) 103(e), both of which authorize a reviewing court to grant relief on account of unpreserved errors when the failure to do so would result in a manifest injustice. Parker's claim, we are convinced, does not meet that standard.

As noted above, Parker testified at trial and admitted that he was with Jodeci Chadwick at the Indi's restaurant on Fern Valley Road just minutes after the Jameson Inn robbery in December 2011. He asserted, however, that he had nothing to do with the robbery and met Chadwick at the restaurant in accordance with a promise he had made earlier that day to lend her some money. During the Commonwealth's cross-examination, Parker reiterated that he had not been in the Jameson Inn that day, and at that point the prosecutor continued as follows:

> Commonwealth: And did you have any contact with Rodericka [Bryant] that night?
>
> Parker: No.
>
> Commonwealth: All right. And Rodericka was, when she testified up here, she was mistaken by saying that you were the

19

person that was with her and Jodeci in carrying out this robbery? She was mistaken?

Parker: No, she wasn't mistaken, she was lying.

Commonwealth: All right. And do you have some . . . I mean . . . if you and her had some conflict or some reasons why she would put you in this serious crime?

Parker: Not that I can, like, think of . . . conflicts . . .

Parker contends that by asking him to characterize Bryant's testimony as "mistaken," the prosecutor engaged in essentially the same misconduct as that condemned in *Moss v. Commonwealth,* 949 S.W.2d 579 (Ky. 1997). In *Moss,* a testifying defendant was "badgered" during cross-examination "into stating that Officer Wiley, a leading witness for the Commonwealth, was lying." *Id.* at 583. "[W]e believe such a line of questioning to be improper," the Court declared. "A witness should not be required to characterize the testimony of another witness, particularly a well-respected police officer, as lying. Such a characterization places the witness in such an unflattering light as to potentially undermine his entire testimony." *Id.*

Here, of course, Parker was not asked to characterize Bryant's testimony as dishonest, and he certainly was not "badgered" into such a characterization. He was asked, rather, whether Bryant's testimony to the effect that Parker participated in the motel robbery was "mistaken." We have a couple of times noted that other courts have distinguished between the "lie" question and the "mistake" question, *see, e.g., St. Clair v. Commonwealth,* 451 S.W.3d 597, 638 (Ky. 2014) (citing *United States v. Gaind,* 31 F.3d 73 (2nd Cir. 1994)), but we

20

have thus far not had occasion to address the propriety of that distinction under *Moss*. Parker contends that, in this case at least, the distinction makes no difference since no one, the prosecutor included, had any reason to think that Bryant was mistaken in thinking another person had participated with her and Chadwick in the robbery.

Once again, however, we need not address whether *Moss* applies to situations in which a witness is asked whether a contrary witness was mistaken, as opposed to lying[9] because once again even if the "mistake" question amounted to a *Moss* violation, the violation certainly did not amount to a palpable error. *See Luna v. Commonwealth,* 460 S.W.3d 851 (Ky. 2015) (noting that, beginning with *Moss* itself, this Court has never found a *Moss* violation to rise to palpable error under RCr 10.26). This is so because, unlike *Moss,* where the prosecutor "badgered" the testifying defendant into characterizing a highly respected police officer's testimony as "lying," and in that way forced the defendant into a position the jury was apt to dislike, here Parker's own theory of the case, made abundantly clear during his cross-examinations of Chadwick and Bryant, was that the two co-indictees were

---

[9] Parker suggests that *Moss* precludes ever, in any manner, confronting a witness with any sort of contrary evidence. He suggests that it was improper for the prosecutor to ask Parker if he could account for the seemingly inculpatory DNA evidence or whether he could verify in any way his testimony that the cash in his possession at the time of his arrest was money from a car accident settlement. Even if these questions were improper—and we definitely do not mean to suggest that they were—Parker did not object to them at trial, and they are so far removed factually from *Moss* that their asserted impropriety under that case cannot be deemed "palpable" for the purposes of RCr 10.26. *Burns v. Level,* 957 S.W.2d 218, 222 (Ky. 1997) (noting that, at least as a general rule, palpable errors for the purposes of RCr 10.26 will be "palpable" in the sense of being "easily perceptible" or "obvious").

21

falsely accusing him (*i.e.,* lying), in furtherance of their own plea bargains. As noted above, Parker readily reiterated that theory when the prosecutor's "mistake" question gave him an opening to do so. Since the prosecutor's "mistake" question, even if it was improper under *Moss,* thus did nothing more than reframe Parker's own implicit accusations that other witnesses had testified falsely, we fail to see how the question can be thought to have prejudiced him, much less how it rendered his trial manifestly unjust.

We reached the same conclusion in *Newman v. Commonwealth,* 366 S.W.3d 435 (Ky. 2012), a sex-abuse case in which the defendant, whose defense was that the allegations against him had been fabricated, was asked during cross-examination whether the two alleged victims were lying. The question violated *Moss,* we allowed, but, we held, "the mere verbalization of the defense theory by the prosecutor, although improper, did not rise to the level of palpable error." 366 S.W.3d at 442. Whether there was a *Moss* violation in the first place is not as clear in this case as it was in *Newman,* but even if there was, it too amounted to no more than a "mere verbalization of the defense theory," and did not amount to palpable error.

## III. Parker's Sentencing Was Not Tainted By Improper Prior Offense Evidence.

Finally, Parker contends that his sentence must be reversed and remanded because during the penalty phase the jury was (or at least might have been) exposed to criminal history data in excess of that allowed under KRS 532.080, the Persistent Felony Offender statute, and KRS 532.055, the

22

Truth in Sentencing statute. Again, Parker concedes that the error he is alleging was not preserved for ordinary appellate review by an appropriate objection during trial. He maintains he is entitled to relief nevertheless under the palpable error provisions of RCr 10.26. Convinced that Parker's nearly minimum PFO-enhanced sentence for two armed robberies cannot be deemed manifestly unjust, we disagree.

As Parker correctly notes, and as the Commonwealth acknowledges, KRS 532.080 and KRS 532.055 permit the introduction, during the penalty phase of a criminal trial, of the defendant's prior convictions and limited evidence of the nature of the prior offenses. The statutes do not allow evidence of prior charges that were amended or dismissed, *Martin v. Commonwealth*, 409 S.W.3d 340, 348 (Ky. 2013) (citing *Chavies v. Commonwealth*, 354 S.W.3d 103 (Ky. 2011)), and they do not allow evidence of more than the elements of prior offenses, precluding admission of the names of prior victims or other identifying details. *Webb v. Commonwealth*, 387 S.W.3d 319, 329-330 (Ky. 2012) (citing *Mullikan v. Commonwealth*, 341 S.W.3d 99 (Ky. 2011)). This cautious construction of KRS 532.055's criminal history provisions was first articulated in *Robinson v. Commonwealth*, 926 S.W.2d 853, 855 (Ky. 1996) (holding that "all that is admissible as to the nature of a prior conviction is a general description of the crime"), and, as the cited cases show, remains our reading of the statute.

During the penalty phase of this case, the prosecutor's paralegal testified concerning Parker's criminal history by reading from certified copies of his five

prior felony convictions. As was also the case in *Martin,* the witness "testified *only* to the actual charges for which a conviction was adjudged." 409 S.W.3d at 348. She did not mention dismissed or amended charges, and beyond specifying the dates of offense and conviction and naming the type of prior offense (*e.g.* "In 2005 he was convicted of robbery in the second degree."), she did not refer to any of the prior offenses' details. The prosecutor, likewise, in her questions, comments, and argument, confined herself to the fact of prior convictions and steered well clear of any but the most general reference to the nature of Parker's prior offenses.

The prosecutor did, however, as in *Martin,* move to introduce into evidence the certified documents that underlay the paralegal's testimony. Those documents, as Parker details at considerable length, include references to, or other evidence of, a number of amended charges, plea agreements, and prior offense details (such as the names of victims) which the cases cited above make clear should not have been admitted. The trial record does not make clear that the certified documents were, in fact, admitted into evidence. And even if they were introduced, the record further does not establish that the jury actually had access to them.[10] Nevertheless, as in *Martin,* 409 S.W.3d at 348, we may presume that the unredacted certified records were erroneously provided to the jury when it retired to deliberate.

---

[10] At the end of its proof, the Commonwealth moved to introduce the "certified records" of Parker's prior convictions, but the trial court declined to rule until Parker's counsel had had a chance to examine them. The ruling, if ultimately there was one, took place off the record, and likewise the record does not show whether the documents were included among the exhibits provided to the jury during its deliberation.

That presumption does not end the analysis, because as *Martin* explains, to be entitled to RCr 10.26 relief for a *Robinson* error, the defendant must be able to show not only that an error occurred, but also that he or she was substantially prejudiced by the error or otherwise was subjected as a result of it to manifest injustice. The mere possibility of prejudice, we held, is not enough. The defendant must show, rather, a likelihood—"a reasonable possibility"—that, but for the error, a different sentence would have been imposed. 409 S.W.3d at 349. In *Martin,* we held that the defendant had failed to show a reasonable possibility of prejudice although, as in this case, certified records of prior convictions had been introduced and those records included information—prior charges that had been dismissed or amended—which should not have been admitted. The prosecutor in *Martin* did not rely on or refer to the improper evidence, and the circumstances of Martin's current offense together with the properly admitted evidence of his prior offenses (six of them in that case) strongly suggested that Martin's sentence—the maximum allowable for his current offense—was not the result of "the jury's awareness of the dismissed or amended charges underlying his criminal past." 409 S.W.3d at 349. Despite the *Robinson* error, accordingly, we denied RCr 10.26 relief.

In this case, too, even if the jury was given access to the certified records documenting Parker's prior offenses and thus was exposed to improper evidence of amended charges and the details of those offenses, there was no reference to the improper evidence in either testimony or closing argument. Moreover, Parker's sentence—not only *not* the maximum allowable, as was the

25

case in *Martin,* but only five years more than the minimum allowable, *i.e.,* twenty-five years instead of life in prison—is readily and reasonably accounted for by properly admitted evidence. He was convicted of two armed robberies (in one of which Parker put a loaded gun to the victim's head), both Class B crimes punishable as Class A crimes (twenty to fifty years or life) because of Parker's PFO status. Additionally, the admissible criminal-history evidence consisted of five prior felonies, including a prior robbery, and showed that the current offenses marked the second time Parker had reoffended while on probation. We are convinced that in these circumstances there is no reasonable possibility that Parker was prejudiced by the *Robinson* error he alleges, and thus, even presuming that the error occurred, he is not entitled on that ground to RCr 10.26 relief.

## CONCLUSION

In sum, Parker was fairly tried and sentenced. The trial court did not abuse its discretion when it refused, on the eve of trial, to continue a case that had been pending for nearly two years and had already been mis-tried once. Parker's belated motion was premised solely on an alleged need to review the Commonwealth's DNA evidence, evidence that Parker had received nearly a year-and-a-half earlier, and evidence he proffered (and proffers) no real reason to think unreliable. Nor was Parker's trial rendered manifestly unjust when he was asked during cross-examination whether a co-indictee's testimony identifying him as a participant in the Jameson Inn robbery was "mistaken." Even if that question is contrary to the spirit of *Moss v. Commonwealth,* the

26

unobjected-to error did not prejudice a defense based precisely on a claim that the co-indictee had falsely accused him.

Parker's sentencing was also fundamentally fair. In particular, his very nearly minimum sentence as a second-degree persistent felon (a status the evidence leaves no room to doubt) cannot reasonably be deemed an improper result of inadmissible prior-offense information that perhaps was included among the exhibits sent to the jury room, but certainly never referred to by the prosecutor. Parker's current crimes and his criminal history (including multiple offenses committed while on probation) strongly and adequately suggest that Parker's sentence was not at all tainted by the unpreserved *Robinson* error he alleges.

Neither Parker's conviction nor his sentence was marred by reversible error. Accordingly, we hereby affirm the Judgment of the Jefferson Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Daniel T. Goyette
Louisville Metro Public Defender
Office of the Louisville Metro Public Defender

Cicely Jaracz Lambert
Assistant Appellate Defender
Office of the Louisville Metro Public Defender


COUNSEL FOR APPELLEE:

Andy Beshear, Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General
Office of the Attorney General

David Bryan Abner
Assistant Attorney General
Office of the Attorney General