# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: DECEMBER 19, 2019
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-000107-MR

FINAL DATE 01-16-20

PHILLIP WAYNE MATTINGLY                                    APPELLANT

ON APPEAL FROM ADAIR CIRCUIT COURT
HONORABLE JUDY DENISE VANCE, JUDGE
V.                                    CASE NO. 17-CR-00200

COMMONWEALTH OF KENTUCKY                                    APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

An Adair County jury convicted Phillip Wayne Mattingly of Operating a Motor Vehicle Under the Influence of Alcohol, Fourth Offense, Aggravated and Persistent Felony Offender in the First Degree. Mattingly received a sentence of twenty years of imprisonment. This appeal followed as a matter of right. *See* Ky. Const. Section 110(2)(b). Having reviewed the record and the arguments of the parties, we affirm the judgment of the Adair Circuit Court.

## I. BACKGROUND

On September 27, 2017, Mattingly, then sixty-three years old, pulled into the parking lot of Cody's Auto Sales in Columbia, Kentucky, exited his vehicle, and began urinating in the parking lot. Cody Withers, the owner of the

business, approached Mattingly and asked if he needed anything. Mattingly replied that he was only staying for a minute and would not bother anything, and Withers asked him to "carry on somewhere else." Withers noted that Mattingly was slurring his speech and seemed unstable, but he attributed this behavior to Mattingly's age. Withers became concerned, however, when Mattingly drove off the lot and crossed into the oncoming lane of traffic before settling into the correct lane. Withers contacted his friend, Columbia Police Officer Josh Brockman, to report Mattingly.

Officer Brock man was on patrol nearby and soon observed Mattingly driving erratically. He eventually stopped Mattingly, who admitted to drinking a couple of beers. Officer Brockman then attempted to perform various field sobriety tests, including the walk-and-turn test, the one-leg stand test, and the horizontal gaze nystagmus ("HGN") test. However, Mattingly refused to perform any of the field sobriety tests.

Officer Brockman then attempted to administer a preliminary breath test ("PBT"). To perform this test, Mattingly needed to blow into a straw on the PBT device. Mattingly initially sucked air inward from the straw, rather than blowing into it as directed. He then attempted to blow air into the device but blocked the flow of air with his tongue. He finally delivered a "quick short breath" through the straw, and the device identified the presence of alcohol. Throughout this encounter with Officer Brockman, Mattingly had bloodshot eyes and was "very thick-tongued," lethargic, and belligerent.

2

Officer Brockman arrested Mattingly and transported him to the local hospital for blood and urine tests. He read the implied consent warning required under KRS 189A.105 and explained the consequences of refusing to consent to the tests. Mattingly refused to take the blood and urine tests. Officer Brockman then transported Mattingly to the Adair County jail. At the jail, Officer Brockman requested a breath test with the facility's Intoxilyzer[1] device. Mattingly refused to take the breath test.

On September 13, 2018, an Adair County jury convicted Mattingly of Operating a Motor Vehicle Under the Influence of Alcohol, Fourth Offense. On that charge, he was sentenced to five years. The jury then heard testimony from Michelle Shanklin, a supervisor with the Department of Probation and Parole, regarding Mattingly's prior convictions and parole eligibility. The jury ultimately found Mattingly guilty of being a Persistent Felony Offender in the First Degree and enhanced his five-year sentence to twenty years. Mattingly now appeals as a matter of right.

## II. ANALYSIS

Mattingly asserts the following errors in this appeal: (1) during its closing argument, the Commonwealth inappropriately referenced Mattingly's refusal to submit to field sobriety tests; (2) the trial court did not sufficiently inquire as to Mattingly's decision not to testify; (3) the trial court erred in permitting Officer

---

[1] The Intoxilyzer is a computerized testing instrument that employs infrared technology to produce breath analysis. *See* Kentucky Handbook Series, Driving Under the Influence Law § 5:9 (Nov. 2018).

3

Brockman to testify about the HGN test; and (4) the probation and parole employee provided incorrect testimony that was manifestly unfair to Mattingly. We address each of these arguments in turn.

## A. The Commonwealth's statements during closing argument did not violate KRS 189A.100.

Under KRS 189A.100(1), "[a] person's refusal to take a preliminary breath test shall not be used against him in a court of law or in any administrative proceeding." However, under KRS 189A.105, a person's refusal to take a breath, blood, or urine test may be used against him in court as evidence of "operating a motor vehicle while under the influence of alcohol, a controlled substance, or other substance that impairs driving ability."[2]

In the present case, the Commonwealth made the following statements during closing argument: "Everybody appreciates the right and privilege and license to operate a vehicle. And if just refusing a test is going to cause that to be forfeited, anybody that's sober-minded, innocent, not guilty of being drunk, would certainly submit to that test to preserve that right to keep driving." Defense counsel objected to these statements, arguing that the statements invaded the province of the jury. The trial court admonished the jury to

---

[2] Although both statutes reference a "breath test," it is clear that KRS 189A.100 and KRS 189A.105 are referencing two different types of tests: a PBT and an Intoxilyzer breath test. On this point, we note that, unlike a portable PBT device, Intoxilyzers must be installed, tested, and maintained at a police station or detention facility. *See* Kentucky Handbook Series, Driving Under the Influence § 5:14. Under KRS 189A.104, breath analysis testing by machines installed, tested, and maintained at such facilities is the type of testing "that is subject to refusal or enhancement of penalties" under KRS Chapter 189A. Accordingly, when KRS 189A.105 refers to a "breath test," it refers to tests performed with an Intoxilyzer device.

4

disregard the prosecution's "last statement." However, when the Commonwealth continued its closing argument, the prosecutor remarked, "I asked you why else would he refuse to take a test, with all those consequences associated with that." Defense counsel did not object to this statement.

Mattingly now argues that the above-quoted statements incorrectly referenced his initial refusal to properly perform the PBT test, thereby violating KRS 189A.100. He also argues that these statements improperly referenced his refusal to perform the field sobriety tests, though he concedes that no statutory provision prohibits referencing such tests. The Commonwealth, on the other hand, argues that these statements reference only the breath, blood, and urine tests, as permitted by KRS 189A.105. Thus, this Court must determine whether the prosecutor's comments referenced Mattingly's initial refusal to take the PBT test or field sobriety tests, or whether it merely referenced his refusal to take a breath, blood, or urine test. Having reviewed the record, we conclude that the statements at issue reference the blood test and were therefore permissible under KRS 189A.105.

In reaching this conclusion, we first note that defense counsel's initial objection was implicitly sustained, as the trial judge admonished the jury to disregard the prosecutor's statements. We presume that the jury followed this admonition, thereby curing any alleged error. *Mills v. Commonwealth*, 996 S.W.2d 473, 485 (Ky. 1999), *overruled on other grounds in Padgett v. Commonwealth*, 312 S.W.3d 336 (Ky. 2010). Therefore, it is the Commonwealth's follow-up statement ("I asked you why else would he refuse to

5

take a test, with all those consequences associated with that.") that we review for unpreserved error. However, to determine whether this statement about "a test" referred to a PBT test or field sobriety test, as Mattingly argues, or a breath, blood, or urine test, as the Commonwealth argues, we must review the statement in context. *See Young v. Commonwealth*, 25 S.W.3d 66, 74–75 (Ky. 2000) (explaining that "we must always consider these closing arguments 'as a whole'" (citation omitted)).

Prior to making this statement, the prosecutor referenced Officer Brockman's training and experience in recognizing impaired driving, which ultimately lead Officer Brockman to conclude that Mattingly was driving under the influence. As a result, the prosecution argued, Officer Brockman transported Mattingly to the hospital for a blood test. The Commonwealth continued,

> [Officer Brockman] took [Mattingly] to the hospital here to find out what exactly a blood test would show. Could we get a level, could we get other drugs perhaps? Is [sic] there other things he's on? Is there medication? Is [sic] there illegal drugs? Is there a blood alcohol level, a number we can put to it? It may have helped him, if he wasn't drunk. Since he was drunk, he didn't want to take the test. Now, he was told that if you don't take this test, it can be used against you—it *will* be used against you. If you don't take this test, the penalty is worse. If you don't take this test, you're going to lose your license to operate a vehicle immediately. Everybody appreciates the right and privilege and license to operate a vehicle. And if just refusing a test is going to cause that to be forfeited, anybody that's sober-minded, innocent, not guilty of being drunk, would certainly submit to that test to preserve that right to keep driving.

Defense counsel objected, and as discussed above, the trial judge implicitly sustained the objection. However, immediately after the bench conference on

6

defense counsel's objection, the Commonwealth stated to the jury, "I asked you why else would he refuse to take a test, with all those consequences associated with that." Mattingly did not object to this second statement. The Commonwealth then began discussing the observations of the second responding officer and made no further references to any tests.

Thus, prior to making the comment at issue, the Commonwealth referenced Mattingly's transportation to the hospital for a *blood* test. The prosecution then discussed the purpose of a blood test and the implied consent warning of KRS 189A.105, which applies only to breath, blood, and urine tests. These statements make no reference, express or implied, to the PBT test or the field sobriety tests. Thus, when the Commonwealth finally argues that a "sober-minded, innocent" person "would certainly submit to that test," it clearly refers to the previously-mentioned blood test. When the Commonwealth continues its closing argument after the bench conference, it refers back to its earlier comments, again referencing the blood test. Furthermore, the prosecutor references "all those consequences associated with" the refusal to take a test. The refusal to take a blood, breath, or urine test can result in various consequences, including the immediate suspension of your license and having that refusal used against you in court. *See* KRS 189A.105. These consequences do not follow the refusal to perform a PBT. Thus, the fact that the prosecutor references "all those consequences" further suggests that he was referring to the blood test, not the PBT. Accordingly, when the statements at issue are reviewed in conjunction with the preceding statements, it is clear

7

that the Commonwealth appropriately referred to Mattingly's refusal to take the blood test, as permitted by KRS 189A.105.

## B. The trial court did not err in declining to inquire further into Mattingly's decision not to testify.

Mattingly next argues that the trial court failed to sufficiently inquire into his decision not to testify, and it is therefore unclear whether Mattingly knew of his right to testify or intended to waive that right.[3] For the reasons set forth below, we disagree.

During a bench conference after the close of the Commonwealth's case-in-chief, defense counsel requested an opportunity to "*Boykin* [Mattingly] on not testifying," apparently referring to *Boykin v. Alabama*, 395 U.S. 238 (1969).[4] Defense counsel explained that he wished to question Mattingly because "all the other courts" he practiced in "have done it that way." The trial judge stated that she did not feel it was necessary to question Mattingly but would permit defense counsel to do so. Defense counsel returned to counsel table and stated, outside the presence of the jury, that Mattingly did not wish to testify. The trial judge then asked defense counsel if he would like to question Mattingly on the right to testify, and counsel did so. Counsel asked

---

[3] A heading in Mattingly's appellate brief suggests that Mattingly also argues that he "was not properly advised of his right to testify on his own behalf." However, the body of the brief contains no argument to this effect. Rather, Mattingly argues only that the trial court was required to inquire further into his decision not to testify. Regardless, as explained below, Mattingly affirmed on the record that he had discussed with his attorney his right to testify.

[4] Under *Boykin*, the trial court must engage in a colloquy with a defendant who wishes to plead guilty to ensure that the plea is voluntary, knowing, and intelligent.

8

Mattingly if they had discussed his right to testify, to which Mattingly responded in the affirmative. Counsel then asked Mattingly to affirm that he had decided not to testify. On the audio recording of this exchange, Mattingly's response to this question is difficult to hear.[5] However, the record reflects that both defense counsel and the trial judge were satisfied with Mattingly's response, as defense counsel ceased questioning.

Mattingly now argues that the trial judge should have inquired further into his decision not to testify. We considered this same issue in *Riley v. Commonwealth*, 91 S.W.3d 560, 562–63 (Ky. 2002). Like defense counsel in the present case, Riley's attorney approached the bench at the close of the Commonwealth's case-in-chief. He informed the trial court that Riley originally intended to testify but had changed his mind and no longer wished to do so. The trial judge did not question Riley about this decision. On appeal, Riley claimed that the trial judge should have questioned him to determine whether his waiver was knowing and intelligent because the court had previously been made aware that Riley was unsatisfied with his public defender. Importantly, like Mattingly, Riley argued only that the trial judge was obligated to question his decision; he did not assert that he had wanted to testify.

In considering Riley's claim, we noted the lack of Kentucky case law addressing this particular issue. *Id.* at 562. We therefore turned to case law from other jurisdictions, explaining that at least one case "suggests that a trial

---

[5] Mattingly asserts that he said that "it's best don't it." Having listened to the audio recording, we cannot say with certainty that this is what Mattingly stated.

9

court has a duty to question the defendant not merely if the defendant is dissatisfied with the quality of his representation, but if the court has reason to believe the defendant's attorney is 'frustrating his desire to testify.'" *Id.* (quoting *United States v. Pennycooke*, 65 F.3d 9, 13 (3rd Cir. 1995)). Because Riley had been unsatisfied with his public defender generally but had given no indication that the attorney was "frustrating his desire to testify," the trial court had not erred in declining to inquire into Riley's decision not to testify. In conclusion, we held, "in accord with the majority of jurisdictions, that the trial court had no obligation to inquire of [Riley] whether he knowingly and voluntarily waived his right to testify." *Id.* at 562–63.

In the present case, Mattingly does not suggest that he was unsatisfied with his trial counsel or that the trial court was aware of any dispute between Mattingly and his attorney. Importantly, he does not argue that the trial court was aware or had reason to believe that defense counsel was frustrating Mattingly's desire to testify. Rather, defense counsel asked to question Mattingly on his waiver of the right to testify, not because of any concern that Mattingly was making an involuntary or unintelligent waiver, but because he had followed a similar procedure in other courts. When questioned, Mattingly clearly responded that he had discussed his right to testify with his attorney. Though Mattingly's other response is difficult to hear, it appears that both defense counsel and the trial judge were satisfied from this answer that Mattingly knowingly and intelligently waived his right to testify. As we held in *Riley*, the trial judge had no obligation to inquire further. We therefore

10

conclude that the trial judge did not err in declining to inquire further into Mattingly's decision not to testify.

## C. Officer Brockman's HGN-related testimony did not result in any prejudice to Mattingly.

During direct examination by the Commonwealth, Officer Brockman testified that there are three standardized field sobriety tests recognized in Kentucky: the walk-and-turn test, the one-leg stand test, and the HGN test. Officer Brockman detailed his training in the administration of these tests and his experiences as a law enforcement officer, including his involvement in approximately 150–200 driving under the influence ("DUI") investigations. He explained that the one-leg stand test is designed to test balance, and the walk-and-turn test is designed to test both balance and coordination. He then began explaining the HGN test,[6] which he described as a "test of the involuntary movement of the eyes." He testified that "nystagmus is defined as the involuntary movement or the jerking of the eye. It becomes evident when your nervous system has been depressed." He then began to explain that "alcohol acts as a depressant."

At this point in Officer Brockman's testimony, defense counsel objected. He argued that Officer Brockman was not a medical expert and was not qualified to testify about the science behind the test. The Commonwealth

---

[6] "The HGN test attempts to measure the reaction of a suspect's eyes to a moving reference such as a pen or a police officer's finger, which is moved back and forth in a horizontal manner in front of the suspect's eyes." Kentucky Handbook Series, Driving Under the Influence Law § 9:13.

11

argued that the officer could testify about "what he's looking for" when performing the test. Defense counsel countered that Officer Brockman's testimony had "gone beyond that" because he was "getting into the science of the nervous system" but was not an expert and was not qualified to talk about physiology. He asserted that an expert was required "to talk about complications of the nervous system." While the trial judge did not expressly overrule or sustain the objection, she directed the Commonwealth, "Just have him testify on what he was looking for and why based on his training."

The Commonwealth then asked Officer Brockman about his certifications. Officer Brockman replied that he is a Kentucky certified and nationally registered EMT. The Commonwealth then asked Officer Brockman what he was looking for when administering the HGN test. When Brockman began to explain what nystagmus is, the prosecutor interrupted and clarified that he was not asking about the science behind the test; rather, he was only asking Officer Brockman to explain what he was looking for during the HGN test, based on his experience and training. Officer Brockman replied that he looks for "the involuntary movement or the jerking of the eyes" or "the inability for smooth pursuit or to accurately follow" his finger as it moves back and forth in front of the person's eyes. He explained that if the pupil "jumps ahead" of the finger and moves back, that is a twitching or jerking movement. The Commonwealth then asked whether the HGN test has "been determined to be scientifically reliable." Officer Brockman responded, "[HGN] is a standardized field sobriety test that is accepted in Kentucky, one of the three." Lastly, the

12

Commonwealth, in reference to jerking eye movements, asked, "Based on your training, what is that an indicator of?" Officer Brockman replied that the jerking is a "completely involuntary movement" which is an "indicator of alcohol." Officer Brockman then explained that Mattingly had refused to perform the field sobriety tests, including the HGN test.

Mattingly now argues that Officer Brockman's testimony regarding the HGN test went beyond the context of his training and layperson observations to become unqualified expert testimony. He further argues that the Commonwealth attempted to bolster the expert opinions by eliciting testimony that Officer Brockman was a certified EMT. The Commonwealth, on the other hand, argues that the trial court properly limited Officer Brockman's testimony to his training and experience.

To resolve this issue, we must first determine whether the trial court sustained defense counsel's objection. In their briefs to this Court, Mattingly represents (without explanation) that the judge overruled the objection, while the Commonwealth asserts that the judge implicitly sustained the objection. We agree with the Commonwealth that the judge implicitly sustained the objection when she directed the Commonwealth to limit the officer's testimony to "what he was looking for and why based on his training." By limiting the testimony in this way, the trial judge prohibited the officer from testifying about the science behind the HGN test, which was the basis for defense counsel's objection. Defense counsel did not seek an admonition to disregard those statements, suggesting that he was satisfied with the trial court's ruling.

Accordingly, the statements made by Officer Brockman prior to defense counsel's objection are not before us for review.

However, the testimony that followed the objection is before us for review. This includes Officer Brockman's testimony about his EMT certification and the HGN-related testimony that followed. Defense counsel did not object to this testimony. Accordingly, we would review any errors in that testimony for palpable error under Kentucky Rule of Criminal Procedure ("RCr") 10.26.

In essence, Mattingly argues that the testimony about the HGN test crossed the line from layperson testimony to expert testimony, and Officer Brockman was unqualified to give such testimony. Though this Court has not yet ruled on this issue—namely, the admissibility of the HGN test to prove intoxication—it has been considered by other states. In some jurisdictions, the HGN test is considered scientific in nature, thereby requiring expert testimony to lay a proper foundation regarding the reliability of the test and the scientific principles upon which it is based. *People v. Smith*, 538 N.E.2d 1268 (Ill. 1989); *Sides v. State*, 574 So.2d 856 (Ala. App. 1990); *Middleton v. State*, 780 S.W.2d 58 (Ark. App. 1989). Other jurisdictions allow the admission of HGN test results without such expert testimony. These jurisdictions conclude that the test is based on the objective personal observations of the administering officer, and a proper foundation is laid when the officer testifies about his qualifications and training. *State v. Murphy*, 451 N.W.2d 154 (Iowa 1990); *Emerson v. State*, 846 S.W.2d 531 (Tex. App. 1993). More generally, the HGN test is often criticized because many factors, including certain health

14

conditions (e.g., brain injury, hypertension, motion sickness) and roadside conditions (e.g., lights from passing cars), can cause the appearance of nystagmus. *See* Kentucky Handbook Series, Driving Under the Influence Law § 9:13.

Regardless, we do not find it necessary to determine the admissibility of HGN evidence because in this case, Mattingly refused to take the HGN test and any alleged error was unpreserved, as noted above. We would therefore review any alleged error for palpable error, requiring Mattin gly to demonstrate that he suffered substantial prejudice or manifest injustice. *Parker v. Commonwealth*, 482 S.W.3d 394, 407 (Ky. 2016).

In this case, however, we conclude that *no* prejudice resulted from Officer Brockman's testimony about the HGN test. Importantly, Mattingly refused to perform the HGN test. Thus, while Officer Brockman's testimony may have provided some background information about the HGN test, that information was of no value, since Mattingly refused to participate in the test. Furthermore, the record contains ample evidence to support Mattingly's convictions. For example, Withers and Officer Brockman testified that Mattingly spoke in a slurred or "thick-tongued" manner, was unstable on his feet, had bloodshot eyes, and acted lethargic and belligerent. Officer Brockman also noted the smell of alcohol emanating from Mattingly's vehicle. Another officer that responded to the scene also testified about the strong odor of alcohol and Mattingly's drunken appearance. Officer Brockman also discussed in detail Mattingly's erratic driving. Furthermore, when Mattingly was pulled

15

over, he admitted to drinking a couple of beers. The testimony at issue does not add to nor detract from this evidence of Mattingly's guilt. Accordingly, to the extent any error stemmed from the HGN-related testimony of Officer Brockman, that error did not result in any prejudice to Mattingly.

### D. The Commonwealth appropriately corrected and utilized the testimony of the probation and parole employee.

Mattingly also argues that the testimony of Michelle Shanklin, a supervisor with the Department of Probation and Parole, contained numerous errors and leading questions and was therefore "manifestly unfair" to Mattingly. For the reasons set forth below, we disagree.

Shanklin testified about Mattingly's prior convictions during the penalty phase of his trial. Mattingly argues that Shanklin's testimony contained several errors and cites specifically to the following issues. First, Shanklin referenced a prior conviction for Promoting Contraband, First Degree, a felony. After an objection by defense counsel,[7] the Commonwealth had Shanklin clarify that Mattingly was charged with Attempted Promoting Contraband, First Degree, a misdemeanor. Next, Shanklin testified that Mattingly had seven prior driving under the influence ("DUI") convictions. The prosecutor stated, "I count eight," at which point Shanklin recounted and responded, "Yes, you are correct, it's eight." Later, Shanklin testified that a defendant convicted of DUI Fourth Offense would be eligible for parole after serving twenty percent of his

---

[7] This was the only objection made during Shanklin's testimony regarding any misstatements by Shanklin.

or her sentence. The prosecutor asked to stipulate to the correct answer, fifteen percent. The Commonwealth then clarified Shanklin's misstatement by asking, "If there's a finding that would enhance the penalty, such as a persistent felony offender, in this case, then would the parole eligibility, am I correct, that it would go up to twenty percent?" Shanklin responded in the affirmative. Later, Shanklin admitted that she was confused when questioned further about parole eligibility; however, the Commonwealth carefully questioned Shanklin about parole eligibility until she provided the correct information.

Mattingly now argues that Shanklin's testimony contained "numerous errors and leading questions." As a result, Mattingly argues, the testimony was confusing and likely misled the jury. In essence, Mattingly argues that the trial court's judgment should be vacated because the incorrect testimony affected the decision of the jury. He correctly notes that incorrect or false testimony violates due process if it is "material," which means there was a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Robinson v. Commonwealth*, 181 S.W.3d 30, 38 (Ky. 2005) (citations omitted). However, this rule is inapplicable to the present matter for at least two reasons.

First, the jury was not presented with any incorrect or false testimony that was not immediately corrected by the Commonwealth. In fact, Mattingly concedes that the errors in Shanklin's testimony were corrected by the prosecution, and he does not cite to any errors in the testimony that the

17

Commonwealth failed to correct. Furthermore, the Commonwealth's closing argument focused on the *correct* sentencing information elicited during Shanklin's testimony, including Mattingly's eight previous DUI convictions. This distinguishes the case from *Robinson*, in which this Court reversed the defendant's sentence and ordered a new sentencing trial. *Id.* at 38. In that case, the false testimony of a probation and parole officer went uncorrected and the prosecution relied on that incorrect information during his closing argument. *Id.*

Furthermore, there is not a "reasonable likelihood" that the testimony at issue "could have affected the judgment of the jury" in this case. On this point, Mattingly states only that the testimony likely misled the jury regarding the amount of time Mattingly would be required to serve.[8] As noted above, however, Shanklin's misstatements were immediately corrected by the prosecution and the Commonwealth's closing argument focused only on the correct information. We have no reason to believe that a jury would rely on a witness's initial misstatements when they were immediately corrected. In other words, the jury's decision to enhance Mattingly's sentence from five to twenty years, the maximum allowed under KRS 532.080(6)(b), was likely unaffected by the corrected misstatements, given Mattingly's eight previous DUI convictions,

---

[8] Mattingly does not explain how this testimony would have affected the jury's decision. However, if the jury believed that Mattingly would be eligible for parole after serving twenty percent of his sentence, rather than fifteen percent, the jury might have been more likely to give him a *lower* overall sentence. Thus, to the extent the testimony could have affected the jury's decision, it likely would have been in Mattingly's favor.

18

one of which occurred while he was released on bond and awaiting trial on the present charges.

Furthermore, to the extent Mattingly now objects[9] to the Commonwealth's use of leading questions, we note that Kentucky Rule of Evidence ("KRE") 611(c) disfavors the use of leading questions during direct examination, except under limited circumstances. That rule provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." In this case, however, the Commonwealth arguably utilized leading questions in an appropriate manner to correct the errors in Shanklin's testimony. For this reason and the reasons set forth above, we find no error in the prosecutor's examination of Shanklin or in his utilization of Shanklin's testimony during closing argument.

## III. CONCLUSION

For the reasons set forth above, we hereby affirm the judgment of the Adair Circuit Court.

Minton, C.J.; Hughes, Keller, Lambert, VanMeter and Wright, JJ., sitting. All concur. Nickell, J., not sitting.

---

[9] Mattingly made no such objection at trial.

COUNSEL FOR APPELLANT:

Dawn Lynne McCauley


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Mark Barry
Assistant Attorney General